# EXHIBIT A

                                                                    1

        1              IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF NEW JERSEY
        2                          (CAMDEN)
                                  - - -
        3    MARYANN COTTRELL and      :   Civil Docket
             RICHARD HOLLAND           :   No. 08cv-5418 (NLH)
        4              Plaintiffs,     :
                                       :
        5         vs.                  :
             J&R DISCOUNT LIQUOR       :
        6    GALLERY, INC., d/b/a      :
             J&R LIQUORS; and DAVID    :
        7    J. STOUT, JR.             :
                       Defendants.     :
        8

        9                          - - -

       10              West Berlin, New Jersey
                       Wednesday, August 26, 2009
       11                          - - -

       12

       13              Deposition of MARYANN COTTRELL, taken

       14    pursuant to notice, at the law offices of Friedman

       15    Doherty, LLC, 125 North Route 73, West Berlin, New

       16    Jersey, on the above date, beginning at 1:40 p.m.,

       17    before Donna A. Bittner, RMR-CRR.

       18                          - - -

       19

       20

       21
                            ANDREA SEGAL REPORTING
       22                   122 Country Farms Road
                           Marlton, New Jersey  08053
       23                      (856) 596-1763

       24

2

```
 1    APPEARANCES:

 2
            WESLEY G. HANNA, ESQUIRE
 3          Friedman Doherty, LLC
            125 North Route 73
 4          West Berlin, New Jersey  08091

 5              Counsel for Plaintiffs

 6
            MARK B. SHOEMAKER, ESQUIRE
 7          Ward Shoemaker LLC
            36 Euclid Street
 8          Woodbury, New Jersey  08096

 9              Counsel for Defendants

10
      ALSO PRESENT:
11
            RICHARD HOLLAND
12

13                      - - -

14

15

16

17

18

19

20

21

22

23

24
```

---

**3**

```
 1              I N D E X
   WITNESS:                    PAGE
 2
   MARYANN COTTRELL
 3
       By Mr. Shoemaker ------------- 4, 78
 4
       By Mr. Hanna ---------------- 77, 81
 5
 6              - - -
 7
   EXHIBITS     DESCRIPTION      PAGE
 8
 9
   (No exhibits were marked for identification.)
10
11
                - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

**4**

```
 1        (It is hereby stipulated and agreed by
 2   and between counsel for the respective parties that
 3   signing, sealing, filing and certification are
 4   waived; and that all objections, except as to the
 5   form of the question, are reserved until the time of
 6   trial.)
 7              - - -
 8        ...MARYANN COTTRELL, 31 South Academy Street,
 9   Glassboro, New Jersey, 08028, after having been
10   duly sworn, was examined and deposed as
11   follows...
12              - - -
13   BY MR. SHOEMAKER:
14   Q.  Good afternoon, Miss Cottrell.
15   A.  Hello.
16   Q.  My name is Mark Shoemaker.  I'm an attorney.
17   I represent J&D Liquors and I also represent Dave
18   Strout in litigation brought on behalf of you and
19   Mr. Holland relating to various allegations of
20   retaliation under the ADA and LAD.
21        I'm here to today take your deposition
22   and I thank you for giving us your time this
23   afternoon.
24        Have you ever been deposed before?
```

---

**5**

```
 1   A.  Sorry?
 2   Q.  Have you ever been deposed before today?
 3   A.  Yes.
 4   Q.  How many times?
 5   A.  Once.
 6   Q.  What was the context?  What sort of matter
 7   was that?
 8   A.  It was a suit against the Borough of
 9   Glassboro.
10   Q.  Is that currently pending?
11   A.  No.
12   Q.  It's resolved?
13   A.  Yes.
14   Q.  Did it go to trial?
15   A.  No.
16   Q.  Did it settle?
17   A.  Yes.
18   Q.  Was that a case brought on your behalf
19   against Glassboro?
20   A.  Yes.
21   Q.  Are you familiar with the general concept of
22   the litigation, what the allegations were?
23   A.  It was first amendment.
24   Q.  Did this have to do with Rowan University?
```

---

**6**

```
 1   A.  No.
 2   Q.  Or was this a different case?
 3   A.  A different case.
 4   Q.  So you've been through this process once
 5   before.  Are you generally familiar with the ground
 6   rules or would you like me to go over them all for
 7   you?
 8   A.  I'd like you to say it again if you don't
 9   mind.
10   Q.  Okay.  I'll hit the highlights of it.
11   A.  Okay.
12   Q.  A deposition is a sworn proceeding.  Although
13   we're in a rather informal setting in your
14   attorney's office, the oath you have just taken
15   applies with the same force and effect as if you
16   were in a court of law before a judge and a jury.
17        Do you understand that?
18   A.  Yes.
19   Q.  I'm going to ask you a series of questions.
20   It is your obligation to answer them completely and
21   truthfully, and a couple things will make that go a
22   little more smoothly.
23        One is please allow me to complete my
24   question before providing an answer.  That serves a
```

---

**7**

1  couple functions. One, you have a very nice court
2  reporter seated to your right. If we both talk at
3  the same time that makes her job very difficult to
4  take down accurately what we say.
5          Do you understand that?
6  **A.** Yes.
7  **Q.** And all the testimony today will become, will
8  be turned into a transcript that for certain
9  purposes may be usable at trial, so it's very
10  important for you to speak clearly so that the
11  court reporter can hear you.
12          Okay?
13  **A.** Yes.
14  **Q.** The other thing it does in allowing me to
15  complete my question is that I can be sure you've
16  heard the whole question and understood it. If you
17  don't understand my question, you should tell me
18  that. Never answer a question you don't
19  understand.
20          Agreed?
21  **A.** Yes.
22  **Q.** So if you answer a question I'm going to have
23  the fair presumption that you have in fact
24  understood the question.

**9**

1  shake your head or nod your head. Keep in mind
2  those type of gestures will not make the permanent
3  record, so if you want to convey something to me it
4  has to be in words.
5          Okay?
6  **A.** Yes.
7  **Q.** And typically people forget at some point and
8  I'll remind you. I'm not being rude. I just want
9  to make sure all of your words get to the
10  transcript.
11          Okay?
12  **A.** Yes.
13  **Q.** Miss Cottrell, where do you currently reside?
14  **A.** 31 South Academy Street, Glassboro.
15  **Q.** How long have you resided there?
16  **A.** About ten years.
17  **Q.** Where whom do you reside at 31 South Academy
18  Street?
19  **A.** Mr. Richard Holland and my daughter Brittany
20  Sloop.
21  **Q.** Her last name is Slope, S-L-O-P-E?
22  **A.** No, S-L-O-O-P.
23  **Q.** Are you Brittany's natural mother?
24  **A.** Yes.

**8**

1          Okay?
2  **A.** Yes.
3  **Q.** I do not want you to guess in response to any
4  question. I don't consider that to be honestly
5  based on personal knowledge.
6          You can estimate or approximate if you
7  tell me you're doing that and certainly if you have
8  personal knowledge you can answer any question you
9  understand.
10          Okay?
11  **A.** Yes.
12  **Q.** Are you, and I don't ask you this because I
13  suspect, but are you under the influence of any
14  medication, alcohol or any other substance that
15  might inhibit your ability to understand my
16  questions or to have an accurate recollection --
17  **A.** No.
18  **Q.** -- of things that happened in the past?
19  **A.** No.
20  **Q.** Do you have any questions of me before we
21  begin?
22  **A.** No.
23  **Q.** One other thing, sometimes people have a
24  tendency to use gestures when they answer or to

**10**

1  **Q.** Do you have sole custody?
2  **A.** Yes.
3  **Q.** How old is Brittany?
4  **A.** She just turned 24.
5  **Q.** And it is my understanding through a review
6  of the pleadings and some other matters that
7  Brittany has some form of disability; is that
8  correct?
9  **A.** Yes.
10  **Q.** What form of disability does or disabilities
11  does Brittany have?
12  **A.** Okay. Well, she's autistic and she's blind.
13  **Q.** Does she have any physical disabilities that
14  impair her ability to walk?
15  **A.** She has other disabilities, but under HIPAA I
16  wish not to disclose that.
17  **Q.** Okay.
18          You have a handicapped parking pass,
19  do you not?
20  **A.** Yes.
21  **Q.** And you are entitled to use that handicap
22  parking pass whenever you are transporting your
23  daughter; is that accurate?
24  **A.** Yes.

**Page 11**

1  **Q.** What was the basis upon which you got the
2  handicapped parking pass?
3  **A.** I got an application to the State of New
4  Jersey Motor Vehicle. I went to her doctor. Her
5  doctor filled it out and I submitted the
6  application and I was approved.
7  **Q.** Was there a particular disability that your
8  doctor relied upon for that application?
9  **A.** Probably both autism and blindness.
10  **Q.** Were there any others?
11  **A.** I don't know.
12  **Q.** You don't know if the doctor included them?
13  **A.** I know autism and blindness. I don't recall
14  if he put anything else and I don't recall what the
15  exact wordage was, but I would say autism and
16  blindness.
17  **Q.** Does Brittany need a wheelchair to get
18  around?
19  **A.** No.
20  **Q.** Does she require any assistive devices like
21  canes or walkers?
22  **A.** Yes.
23  **Q.** Which does she use?
24  **A.** She has a white cane.

**Page 12**

1  **Q.** Is that a one-point or a four-point cane?
2  **A.** A white cane is specifically for blind
3  individuals.
4  **Q.** Okay.
5       Does she require any sort of walker or
6  cane for assistance in walking itself as opposed to
7  vision?
8  **A.** No.
9  **Q.** Does she require the assistance of another
10  individual to get around?
11  **A.** Yes.
12  **Q.** And you are one of those people I assume?
13  **A.** Yes.
14  **Q.** And how about Mr. Holland?
15  **A.** Yes.
16  **Q.** Does anyone else on a routine basis help her
17  to get around?
18  **A.** Yes.
19  **Q.** Who would that be?
20  **A.** Her caretakers through an agency.
21  **Q.** How often do the caretakers take care of
22  Brittany?
23  **A.** Monday through Friday.
24  **Q.** Is that more or less during work hours?

**Page 13**

1  **A.** That's just the time that we have the
2  contract for.
3  **Q.** I'm not sure --
4  **A.** I think that's the best time that suits her
5  needs.
6  **Q.** Is there a time frame each day where they
7  come?
8  **A.** From 11:30 to 3:30.
9  **Q.** Are those caretakers, the agency that
10  provides them, is that funded by some state
11  program?
12  **A.** Yes, Real Life Choices through the State of
13  New Jersey.
14  **Q.** Other than receiving some benefits from the
15  state program you just mentioned --
16  **A.** Yes.
17  **Q.** -- are you in any way affiliated with that
18  program aside from that?
19  **A.** No.
20  **Q.** Are you affiliated with any advocacy groups
21  related to the disabled?
22  **A.** No. Could you describe the word affiliated?
23  **Q.** Are you members of any groups that provide
24  support or advocacy for the disabled?

**Page 14**

1  **A.** I'm a member of LRC. They provide resource
2  materials.
3  **Q.** What does LRC stand for, do you know?
4  **A.** Learning Resource Center.
5  **Q.** Okay.
6  **A.** I have people that I talk to, the Community
7  Law Project, which anybody that's disabled would
8  have access to. The ADA itself, they have a
9  technical center.
10  **Q.** And that's more of a resource of information
11  as opposed to a group? For example, the National
12  Rifle Association is an example of a group.
13  **A.** The Community Law Project would be a resource
14  of information and ADA technical support would be
15  an area to receive information.
16  **Q.** Have any of those entities ever provided you
17  with legal support?
18  **A.** No.
19  **Q.** Would I be correct in my presumption that
20  Brittany was diagnosed with autism at a relatively
21  young age?
22  **A.** Yes.
23  **Q.** Was she also born blind?
24  **A.** No.

|  | 15 |  | 17 |
|---|---|---|---|
| 1 | **Q.** That developed over time? | 1 | **A.** No. From 2000 to 2004? Would you repeat |
| 2 | **A.** Yes. | 2 | that? |
| 3 | **Q.** She's legally blind now? | 3 | **Q.** Yes. |
| 4 | **A.** Yes. | 4 | From the year 2004 to the present am I |
| 5 | **Q.** Do you recall was there a specific year where | 5 | correct that neither you nor Mr. Holland had any |
| 6 | she was determined or found to be blind? | 6 | gainful employment? |
| 7 | **A.** Age 19. | 7 | **A.** No, Mr. Holland has worked at Rowan |
| 8 | **Q.** So it was about five years ago? | 8 | University. |
| 9 | **A.** Yes. | 9 | **Q.** Okay. When did he work at Rowan? |
| 10 | **Q.** Is she able to work? | 10 | **A.** It was March of 2008 to July 12th of 2008. |
| 11 | **A.** No. | 11 | **Q.** In what capacity? |
| 12 | **Q.** I presume she was never licensed to drive a | 12 | **A.** Facilities landscape. |
| 13 | car? | 13 | **Q.** In between 1999 and March of 2008 he was not |
| 14 | **A.** No. | 14 | employed? |
| 15 | **Q.** Are you currently employed? | 15 | **A.** There was a period of workman's comp. he was |
| 16 | **A.** No. | 16 | on. |
| 17 | **Q.** Have you ever been employed? | 17 | **Q.** Workman's compensation? |
| 18 | **A.** Yes. | 18 | **A.** Yes. |
| 19 | **Q.** When were you last employed? | 19 | **Q.** So there would be some sort of monthly |
| 20 | **A.** 2004. | 20 | stipend that came in? |
| 21 | **Q.** In what position? | 21 | **A.** Yes. |
| 22 | **A.** Okay. I worked for it was Verizon. Before | 22 | **Q.** I'm not going to get into how much. That's |
| 23 | that it was Bell Atlantic and they when they had | 23 | not my business. |
| 24 | the name change it's Verizon now, directory | 24 | **A.** Okay. |

|  | 16 |  | 18 |
|---|---|---|---|
| 1 | assistance. | 1 | **Q.** Between 2004, do you know what month you |
| 2 | **Q.** How long did you hold that position? | 2 | stopped working with Verizon? |
| 3 | **A.** For four years. | 3 | **A.** Yes. It was August of 2004. |
| 4 | **Q.** Was that a full time or a part-time job? | 4 | **Q.** So between August of 2004 and March of 2008 |
| 5 | **A.** That was full time. | 5 | were either you or Mr. Holland gainfully employed? |
| 6 | **Q.** Was it daytime hours? | 6 | **A.** No. |
| 7 | **A.** They have different shifts. It all depends | 7 | **Q.** Did you have between the two of you any |
| 8 | on what they, by seniority, what you got. | 8 | sources of income? |
| 9 | **Q.** So new people get stuck with the graveyard | 9 | **A.** Yes. I had income. |
| 10 | shift, that sort of thing? | 10 | **Q.** From what source? |
| 11 | **A.** Yeah. | 11 | **A.** Um, alimony and child support. |
| 12 | **Q.** So that was around 2000 or so to 2004? | 12 | **Q.** Any other sources of income between the two |
| 13 | **A.** Yeah. It was the latter part of 1999 to | 13 | of you for that time frame? |
| 14 | 2004. | 14 | **A.** Well, I've had settlements. |
| 15 | **Q.** During that same time frame was Mr. Holland | 15 | **Q.** For litigations in Federal Court? |
| 16 | employed? | 16 | **A.** Yes. |
| 17 | **A.** No. | 17 | **Q.** One of those settlements was for |
| 18 | **Q.** Is Mr. Holland employed now? | 18 | approximately $10,000, is that right, gross? |
| 19 | **A.** No. | 19 | MR. HANNA: Objection. |
| 20 | **Q.** Is Mr. Holland on any form of disability? | 20 | THE WITNESS: I cannot give that |
| 21 | **A.** No. | 21 | information out. |
| 22 | **Q.** So from 2004 to the present am I correct that | 22 | MR. HANNA: She's under a |
| 23 | neither you nor Mr. Holland had any gainful | 23 | confidentiality agreement for the settlements. |
| 24 | employment? | 24 | MR. SHOEMAKER: Well, the one I |

**19**

1  mentioned can't be confidential, it's public
2  record.  That's how I know.  It's online.
3          MR. HANNA:  Go ahead.
4  BY MR. SHOEMAKER:
5    **Q.** Was one of your settlements for $10,000?
6          MR. HANNA:  Which one was this?
7          MR. SHOEMAKER:  I forget.  It's on
8  PACER.
9          Let me go off the record for a second.
10         (Discussion held off the record.)
11 BY MR. SHOEMAKER:
12   **Q.** Is it true that you have resolved certain
13 pending litigation regarding LAD and ADA violations
14 for cases that previously were pending in Federal
15 Court?  I'm not asking you how much, but there are
16 cases you have settled?
17   **A.** Okay.  Just say that one more time.  I'm
18 sorry.
19   **Q.** You have pursued cases other than the one I'm
20 involved in relating to ADA, alleged ADA and LAD
21 violations; correct?
22   **A.** Yes.
23   **Q.** Have you settled certain of those cases?
24   **A.** Yes.

**20**

1    **Q.** And am I correct that under the terms of
2  those settlements you are not permitted to disclose
3  the amount of the settlements?
4    **A.** Yes.
5    **Q.** How many cases have you settled that resulted
6  in some amount of money being paid to you?
7    **A.** Three.  I believe it's three.
8    **Q.** Between August of 2004 when you stopped
9  working with Verizon and March of 2008 when
10 Mr. Holland had some temporary employment with
11 Rowan, did you have any sources of income other
12 than alimony, child support and the proceeds of
13 three cases that you settled from Federal Court?
14   **A.** There is another case that was not ADA which
15 you stated before.
16   **Q.** Is that the first amendment case against
17 Glassboro?
18   **A.** Yes.
19   **Q.** Were the terms of that settlement
20 confidential --
21   **A.** Yes.
22   **Q.** -- by agreement?
23   **A.** Yes.
24   **Q.** And that case settled in a time frame of 2004

**21**

1  to 2008?
2    **A.** Yes.
3    **Q.** Without the settlement funds that came from
4  the four cases you told me about, would you have
5  been able to make ends meet, meet your bills and so
6  forth from 2004 to 2008?
7    **A.** Yes.
8    **Q.** With only alimony and child support?
9    **A.** Yes.
10   **Q.** Are you currently looking for employment?
11   **A.** Yes, I am.
12   **Q.** Do you have any resumes out?
13   **A.** No.
14   **Q.** Are you looking in any particular field?
15   **A.** I went to New Jersey Unemployment and now
16 since they've sent me because of my vision they
17 sent me to rehabilitation services and I spoke to
18 them and they said that I have to finish with, I
19 just had an eye operation, I need a second one, and
20 they said that I can't seek employment until my
21 health issues are dealt with.
22   **Q.** Okay.
23         My understanding is that a second
24 procedure is scheduled for next month; is that

**22**

1  right?
2    **A.** Yes.
3    **Q.** Once the second procedure is completed is it
4  anticipated you'll have good vision?
5    **A.** Hopefully.
6    **Q.** Who are you treating with for your eyes?  Is
7  it Wills Eye Hospital?
8    **A.** Yes.
9    **Q.** Once you've completed that treatment and job
10 rehabilitation is it your intention to go back to
11 the work force?
12   **A.** Yes.
13   **Q.** Do you know if Mr. Holland is attempting to
14 return to the work force?
15   **A.** Yes.
16   **Q.** What kind of job is he looking for?
17   **A.** Well, he presently has, he was terminated
18 from his position and he has a hearing appeal to
19 get his job back.
20   **Q.** Did Mr. Holland initiate litigation against
21 Rowan University?
22   **A.** Well, when he -- can you explain that, what
23 you mean by that question?
24   **Q.** Well, did Mr. Holland either himself or

23

1   through counsel file a lawsuit against Rowan?
2   **A.** Well, when you -- when you're an employee of
3   the state you request in writing for a hearing
4   which is through the Merit Board but now it's
5   called the Civil Service Commission and he's doing
6   that pro se.
7   **Q.** That's an administrative type process?
8   **A.** It's under Office of Administrative Law.
9   **Q.** Did you or did attorneys on your behalf file
10  a suit against Rowan University?
11  **A.** That's an unrelated matter.
12  **Q.** Okay. I understand that, but you did?
13  **A.** Yes.
14  **Q.** What was that relating to?
15  **A.** That was relating to accessibility,
16  retaliation, being banned from the property.
17  **Q.** What is the current status of that suit if
18  you know?
19  **A.** What the current status is is that it's in
20  discovery phase right now.
21  **Q.** Going back to Mr. Holland, if you know, what
22  reason did Rowan give for terminating him?
23  **A.** Job performance.
24  **Q.** And obviously Mr. Holland disagrees with that

24

1   assessment?
2   **A.** Yes.
3   **Q.** That's why he's appealing?
4   **A.** Yes.
5   **Q.** In your Complaint you refer to yourself or
6   your attorney referred to you as an advocate for
7   the disabled. Is that an accurate label do you
8   think?
9   **A.** Yes.
10  **Q.** When did you first become active as an
11  advocate for the disabled?
12  **A.** Shortly after my daughter was diagnosed.
13  **Q.** With autism?
14  **A.** Yes.
15  **Q.** How long ago was that?
16  **A.** 1987.
17  **Q.** Initially what form did your advocacy take?
18  **A.** I, through my father was a legislator, I
19  petitioned the State of New Jersey to increase
20  their funding to early intervention because
21  services were limited and I thought it was very
22  important to increase the budget because she needed
23  additional speech and therapy and that was the
24  beginning basis that you start with a child that's

25

1   disabled and that was my first incident of
2   advocacy. I also co-founded an organization that
3   provided a recreational program for children with
4   autism and I petitioned different educational
5   institutions to allow for programs to be held
6   there.
7   **Q.** What was the name of that group that you
8   co-founded?
9   **A.** Dreams For Tomorrow.
10  **Q.** Does that still exist?
11  **A.** No.
12  **Q.** What happened to it?
13  **A.** Um, when I became a single mother I didn't
14  have the time because I practically ran the whole
15  show, you know, the fund raising and I just didn't
16  have the time. I had to go back to work.
17  **Q.** What about when did you stop your activities
18  with Dreams For Tomorrow?
19  **A.** Let's see. 19, just before -- 1998,
20  somewhere around there.
21  **Q.** Were there any other things you did in terms
22  of advocacy before you began writing tickets for
23  handicapped parking?
24  **A.** Well, I -- if there were stores or if I was

26

1   in a situation or if I had, my mother was disabled,
2   she was in a wheelchair, if there was incidents
3   where she was not able, I was not able to take her
4   somewhere I would go into the store and explain to
5   them that you have to provide accessibility for
6   people in wheelchairs or something was in the way,
7   you've got to make sure that, you know, the area is
8   free and unobstructed because I had to deal with
9   pushing her in a wheelchair.
10      I went to family support meetings and
11  some parents that didn't have any knowledge or I
12  had some knowledge to share, I would speak up at
13  the meeting and receive them after the meeting and
14  give them some information, just anything that
15  advocacy, anything that touches my life that to
16  make anything accessible not only for myself
17  because I'm in a particular situation would be for
18  another disabled person. I would bring that to
19  their attention.
20  **Q.** Now, going back to the instances where you
21  would speak to somebody at stores when they had ADA
22  accessibility problems, did you speak to
23  management, a supervisor? Typically who would you
24  speak to?

27

1  **A.** I would speak to a manager. Like if I was in
2  a store and my daughter, a display was in the way,
3  I would say to them that the display is in the way,
4  she could have hurt herself and that it needed to
5  be 36 inches.
6  **Q.** What kind of stores are we talking about?
7  Like a Sears or a J.C. Penney or --
8  **A.** A drug store, a grocery store.
9  **Q.** And what kind of reception did you get when
10 you brought this to their attention?
11 **A.** A very good reception.
12 **Q.** Was there a point when you decided to stop
13 taking those kind of concerns to store management
14 and begin issuing tickets instead?
15 **A.** Say that again. I'm sorry.
16 **Q.** Was there a time when you decided to stop
17 bringing those types of concerns to management of
18 stores?
19 **A.** No, because then on the other end if I
20 received bad I also received, I'm sorry, if I also
21 received good responses, I also received bad
22 responses.
23 **Q.** Okay.
24        In relation --

29

1  **Q.** Okay.
2  **A.** And people are rude, but sometimes they're
3  not rude.
4  **Q.** Well, in that particular situation it was you
5  and Mr. Holland alone, you didn't have your
6  daughter when you took pictures, and it was a
7  medical facility for psychiatric patients and you
8  told me you don't do that, you don't go in and talk
9  to the supervisors.
10       Why don't you do that anymore?
11 **A.** Why don't I do that --
12 **Q.** Yes.
13 **A.** -- anymore?
14 **Q.** Let's take that circumstance. What was there
15 about that circumstance that you didn't go in and
16 try to talk to somebody instead of writing a dozen
17 tickets?
18 **A.** The circumstance was, it's because there were
19 private vehicles parked in the handicapped spots.
20 They had no credentials. And then you had other
21 vehicles that were vans that didn't have any
22 handicapped credentials either.
23 **Q.** Right.
24       My question is, let's take that

28

1  **A.** Where I was ignored.
2  **Q.** At some point did you stop going to
3  management of any stores when you saw different ADA
4  type violations?
5  **A.** Well, no. It all depends if I had my
6  daughter with me or, you know, I had the time to
7  address it. It all depended upon the circumstance.
8  **Q.** Okay.
9        You may or may not remember this. I
10 represented New Point Behavioral Health in
11 connection with a dozen or 15 tickets you wrote
12 against them, and on cross-examination I asked you
13 whether you attempted to go talk to a supervisor
14 because a van was in a handicapped spot and you
15 told me in essence that you don't do that because
16 people are rude to you and harass you when you do
17 it.
18       Do you remember saying that?
19 **A.** Do I remember saying that? No.
20 **Q.** Does it sound accurate as far as how you
21 feel?
22 **A.** Well, there was a point where I did say it,
23 but as I said to you, it depends on the
24 circumstance.

30

1  situation in specific. What was it about that
2  situation that deterred you from walking in and
3  asking to speak to somebody with authority about
4  what you saw as a violation?
5  **A.** Because it's a private vehicle. It's not
6  like I'm bringing -- it's not like I went and
7  signed, it's just that I analyze the situation and
8  because it was a private vehicle I decided to take
9  a picture of it to document the violation.
10 **Q.** Several times?
11 **A.** Sorry?
12 **Q.** Several times? My question is, there is more
13 than one way to achieve the same goal; agreed?
14 **A.** If you're parked illegally in a handicapped
15 spot and you don't have a credential, then you
16 can't be parked there.
17 **Q.** Understood.
18       As to the person who parked there,
19 right, but you also write tickets against property
20 owners for failing to provide access? You're
21 familiar with the two different types of tickets;
22 right?
23 **A.** Yes.
24 **Q.** My question really for you is, how do you

**31**

1  decide when you should go talk to management of a
2  property owner about something you see that's a
3  violation as opposed to just writing a ticket and
4  seeing them in court?
5  **A.** Well, when it's a motor vehicle type of thing
6  I usually don't go in and talk about it. If they
7  are obstructing with merchandise in a handicapped
8  space or they, um, are getting their own delivery
9  or they're getting a delivery there then I will say
10 something if I have the opportunity.
11       But if there is just a private vehicle
12 in there you may not have aware -- you know, you
13 may not be aware of who it is.
14 **Q.** That's true.
15 **A.** And by taking the information down and giving
16 the information to the police, then they give it to
17 the court clerk. Then I write the summons and that
18 would be the notification that there is something
19 wrong.
20 **Q.** So under that way of proceeding the first
21 time an owner is going to know about a problem on
22 their lot is when they get a ticket; right?
23 **A.** When I sign a ticket, yes.
24 **Q.** Now, did I hear you correctly that one of the

**32**

1  scenarios that would lead you to talk to the
2  manager of a facility is when there is loading and
3  unloading going on that may obstruct a handicapped
4  space; is that right?
5  **A.** At some times, yes, when I have the
6  opportunity.
7  **Q.** Now, the tickets that you caused to be issued
8  in this particular situation against J&D Liquors,
9  for the most part those tickets related to loading
10 and unloading of beer and soda; correct?
11 **A.** I don't know what they were unloading. I
12 couldn't tell you if they were unloading soda.
13 **Q.** You took pictures of the trucks; right?
14 **A.** Right.
15 **Q.** And the trucks were a Coors Light truck, a
16 Miller Light truck and a Coke truck.
17 **A.** Okay. Well, you're breaking them down into
18 separate companies. You're saying, okay, I
19 didn't -- I thought you were saying whether Coors
20 delivers soda. I don't know that. You know what
21 I'm saying?
22 **Q.** Those trucks were probably delivering some
23 sort of product to J&D Liquors, is that fair to
24 assume?

**33**

1  **A.** Yes.
2  **Q.** Okay. And I'm assuming it, too. I don't
3  know one way or the other.
4        In advance of writing any of those
5  tickets did you take it upon yourself ever to go
6  into the store and ask to speak to somebody with
7  authority about the practice of how products were
8  getting delivered into the store?
9  **A.** No.
10 **Q.** Why not?
11 **A.** I'm sorry?
12 **Q.** Why not?
13 **A.** Because -- are you talking about J&D Liquor?
14 J&D Liquor itself or are you talking about a broad
15 range of --
16 **Q.** J&D Liquor in specific, the tickets you
17 issued to J&D or you caused to be issued.
18 **A.** Well, when I first wrote the first ticket it
19 was against the property owner and the tickets
20 thereafter, that was the property owner meaning
21 their vehicle, okay, and then the subsequent
22 tickets were of the delivery trucks and then it was
23 the pattern and practice that it was a continuing
24 ongoing practice.

**34**

1  **Q.** Did you speak to anyone, make any efforts to
2  speak to anyone at J&D or the drivers of the trucks
3  you saw parked at J&D about your opinion that I
4  presume you had that it was inappropriate to park
5  the trucks where they were during deliveries?
6  **A.** No. I didn't want any confrontation.
7  **Q.** Okay.
8        And that's more or less what I recall
9  you saying in the New Point case, you didn't want
10 confrontation. What do you mean by that?
11 **A.** I don't want the person yelling at me and
12 threatening me or striking me.
13 **Q.** So you're afraid a delivery driver would
14 strike you if you tried to address concerns about
15 handicapped parking?
16 **A.** I would be afraid if they tried to
17 aggressively come after me, be mad.
18 **Q.** Would you have the same concern about the
19 owner of a liquor store or a manager of a liquor
20 store?
21 **A.** I would be concerned that if I gave an
22 indication that something was wrong as a pattern or
23 practice, that I might be retaliated upon.
24 **Q.** When you wrote the tickets for obstruction

Case 1:08-cv-05418-NLH-KMW Document 18-1 Filed 01/05/10 Page 12 of 24 PageID: 197

Cottrell and Holland vs. J&K Discount Liquor Gallery, Inc., et al    Maryann Cottrell, 8/26/09

---

**35**

1  regarding the delivery trucks, at that point in
2  time were you aware that the union contracts for
3  the delivery drivers provided that they were not
4  allowed to go up and down steps during deliveries?
5  **A.** I have no knowledge of that.
6  **Q.** So you were not aware that they had to use
7  the front doors to make their deliveries; is that
8  right?
9  **A.** I'm not aware of any regulation.
10  **Q.** You certainly never asked the drivers if
11  there was a reason why they were delivering where
12  they were; is that right?
13  **A.** I did not speak to the drivers.
14  **Q.** When did you begin your practice of causing
15  citizens complaints for handicapped parking and
16  obstruction?
17  **A.** When did I begin this?
18  **Q.** Yes.
19  **A.** Well, I began signing citizen complaints in
20  2005 after asking a police officer to sign the
21  complaint and he refused to.
22  **Q.** Do you remember what township that was in?
23  **A.** Glassboro.
24  **Q.** Did you initiate any complaint or proceedings

**36**

1  against that officer?
2  **A.** It was the officer's discretion. No.
3  **Q.** You live in Glassboro; right?
4  **A.** Yes.
5  **Q.** Were most of your initial complaints heard in
6  Glassboro Municipal Court?
7  **A.** Some were heard in Glassboro.
8  **Q.** When you first started writing tickets what
9  kind of tickets were you causing to be issued?
10  **A.** Different tickets. Handicapped parking,
11  parking on the sidewalk, all accessibility,
12  accessibility tickets, parking in the sidewalk,
13  blocking a cut curb, blocking a ramp, parking on
14  top of a ramp.
15  **Q.** All those type of tickets seem to be tickets
16  you would file against the owner of the vehicle as
17  opposed to a owner of a premises; is that right?
18  **A.** No.
19  **Q.** When you first started doing it?
20  **A.** That's not right.
21  **Q.** What other type of tickets did you cause to
22  be written?
23  **A.** It's the same. Well, they would be failure
24  to provide access. If they put their merchandise,

**37**

1  if they put a new car on a ramp or blocking a cut
2  curb or doing, breaking up or just blocking it with
3  any type of material, you know, live plants,
4  setting up a tent in it, you know, blocking it,
5  tables. I mean, it's all kind of different
6  obstructions.
7  **Q.** What I was getting at is that from the
8  beginning then you were causing citizens complaints
9  to be issued both against owners of vehicles as
10  well as owners of the property?
11  **A.** Yes.
12  **Q.** Are you still causing citizens complaints to
13  be issued?
14  **A.** Yes.
15  **Q.** Is it any more intense or less intense than
16  it once was? When I say intense I mean number of
17  tickets per month.
18  **A.** I think that in Glassboro I've seen a decline
19  in violations. I've had people come up to me and
20  say that I've made a difference, that they feel
21  there is more accessibility in Glassboro and
22  thanked me for it.
23  **Q.** Over the time where you have been issuing
24  citizens complaints can you estimate or

**38**

1  approximate, tell me exactly if you can, how many
2  tickets you've caused to be issued?
3  **A.** I don't know. I'm just giving an estimate,
4  okay, about 800.
5  **Q.** And what towns were those tickets issued in?
6  **A.** Glassboro, Pitman, Mantua, Woodbury, Woodbury
7  Heights, East Greenwich, Elk Township, Monroe
8  Township. That's all I think -- Washington
9  Township and then there is other counties.
10  **Q.** Other counties?
11  **A.** Yeah.
12  **Q.** What other counties?
13  **A.** Ocean County and Camden County.
14  **Q.** Filing a complaint in Ocean County would
15  cause you to have to travel all the way out there
16  to testify?
17  **A.** That's where my mother lived.
18  **Q.** Okay.
19  Now, in certain of these cases I
20  presume the people who you issued tickets would
21  just pay them and there is no trial; right?
22  **A.** Yes.
23  **Q.** In the cases that have been tried, you've won
24  some and lost some; is that right?

**39**

1   **A.** Yes.

2   **Q.** Have you kept track of how many you've won

3   and how many you've lost?

4   **A.** No.

5   **Q.** Can you give me a sense as to whether you've

6   won more than you've lost?

7   **A.** I've won more than I've lost.

8   **Q.** Do you have any percentage you could give me,

9   60-40, 70-30, 90-10, whatever the case may be?

10  **A.** 70-30.

11  **Q.** And 70 being the ones you won; right?

12  **A.** Right. It could be even higher than that,

13  but you're asking me for an estimate.

14  **Q.** And that's all you can do, and you told me

15  you're estimating and that's not an exact number.

16  Now, have there been situations where in connection

17  with your activities as an advocate for the

18  disabled people have caused citizens complaints for

19  harassment to be issued against you?

20  **A.** Yes.

21  **Q.** Do you know how many times that has occurred?

22  **A.** Let's see. About 10 I'm estimating.

23  **Q.** Do you know what townships they were in?

24  **A.** Glassboro, Washington Township, Woodbury,

**40**

1   West Deptford.

2   **Q.** Shall we add West Deptford to the list?

3   **A.** Yes. I was going to say, you might as well

4   add West Deptford.

5   **Q.** So the record is clear, we're adding it to

6   the list of places where you've issued tickets?

7   **A.** Yes.

8   **Q.** Is that it, those four?

9   **A.** Let's see. I said Washington Township.

10  **Q.** Glassboro, Washington Township, Woodbury and

11  West Deptford.

12  **A.** Woodbury Heights, Mantua I think. I'm not

13  sure. Did I put Mantua on the other list?

14  **Q.** Yes, you did.

15  **A.** Okay. That's to my recollection, that's all

16  I can remember right now.

17  **Q.** Do you remember the names of any of the

18  people who caused harassment complaints to be

19  issued against you?

20  **A.** In the town. I can remember some of them,

21  but I don't remember all of them.

22  **Q.** Which ones do you remember?

23  **A.** In Woodbury it would be Robinson.

24  **Q.** Do you remember a first name?

**41**

1   **A.** Jacqueline.

2           Washington Township, I don't remember

3   the lady's name. I don't remember that, I really

4   don't. Let's see. What were the other ones there?

5   **Q.** Glassboro.

6   **A.** Glassboro Public Schools.

7   **Q.** West Deptford?

8   **A.** Frank Macciocci.

9   **Q.** Is Frank a police officer?

10  **A.** No.

11  **Q.** Anybody else in West Deptford?

12  **A.** This is for harassment?

13  **Q.** Yes.

14  **A.** No, I can't remember.

15  **Q.** How about Woodbury Heights?

16  **A.** It was a gentleman, I'm trying to remember

17  his name. I can't. I don't remember his name, to

18  be honest with you.

19  **Q.** I didn't give you this instruction before,

20  but it will come up here. If you recall the answer

21  to any question or you want to change an answer to

22  a question later on based on something we said

23  earlier, you can always stop me and do that for

24  you.

**42**

1           But as far as the number of harassment

2   complaints, you think 10 is a pretty good estimate?

3   **A.** You mean all together?

4   **Q.** All together, harassment complaints filed

5   against you.

6   **A.** I don't usually look over my records, hon.

7   Once the case is closed it's closed. I really

8   don't think about it anymore. It could be between

9   10 and 20. I'm not sure. And again I am thinking

10  that maybe that it wasn't harassment. I don't

11  know. It could have been something else. It could

12  have been they charged me with motor vehicle stuff.

13  I really don't know. I can't remember because once

14  a case is closed I just put it in the file.

15  **Q.** Have you ever gone through a trial on a

16  harassment case against you?

17  **A.** Yes.

18  **Q.** Have you ever been found guilty?

19  **A.** Of harassment?

20  **Q.** Yes.

21  **A.** I don't know what the -- I don't remember the

22  Glassboro Public School, if it was harassment. I

23  know there was a charge against me, but no, I

24  haven't been found guilty of harassment ever.

43

1    Q. You were found guilty of something in the
2    Glassboro Public School matter?
3    A. No, I wasn't found guilty. It was
4    overturned.
5    Q. On appeal?
6    A. Yes.
7    Q. So you have not been found guilty of anything
8    in -- well, I'm not going to be that broad.
9           Since we're on Glassboro, have you
10   ever filed any ethics complaints against sitting
11   Municipal Court judges?
12   A. Yes.
13   Q. Who?
14   A. Judge Golden -- Judge Powell.
15   Q. You started to say I think Judge Golden. Was
16   it him, too?
17   A. Golden.
18   Q. So both, you filed ethics complaints against
19   both Judge Powell and Judge Golden?
20   A. Yes.
21   Q. Let's start with Judge Powell. What was the
22   basis of your ethics complaints?
23   A. Um, he allowed the courtroom to go out of
24   order. He allowed people to ridicule me, to make

44

1    outbursts and threats against me in the courtroom.
2    He prevented me from testifying when I was a
3    defendant. That's all I can remember right now.
4    Q. Do you know what the outcome was of those
5    charges?
6    A. Well, they said that there was nothing that
7    they could -- it wasn't under judicial, that I
8    would have to take a private suit. I don't
9    remember what their exact wordage was, but they
10   didn't find anything.
11   Q. While those ethics charges were pending did
12   Judge Powell transfer any cases that otherwise
13   would have been in front of him to a different
14   judge?
15   A. At first he reclused himself and then Judge
16   Springman came in.
17   Q. Now, you filed an ethics complaint against
18   Judge Golden as well?
19   A. Yes, and I think I filed one against Judge
20   Springman, too. I'm not sure.
21   Q. What was the basis of your ethics complaint
22   against Judge Golden?
23   A. Again, this is a while ago. I'm trying to
24   recollect. Okay. It was merging on tickets. It

45

1    was more like a finding on handicapped and not
2    looking at the evidence I believe.
3    Q. I'm not quite sure I follow. You thought
4    that he did something inappropriate with the way he
5    merged tickets, is that what you said?
6    A. Like if they had two handicapped violations
7    he merged -- if they had like two different
8    handicapped violations on two different days, he
9    merged it instead of treating one and one as two
10   separate violations, which they were, on two
11   separate days. He merged the both of them and they
12   only paid the one fine.
13   Q. So that was not the result of a plea deal,
14   that was on the merits of a case?
15   A. No. I guess it was -- it's what the
16   prosecutor recommended to the judge, I believe.
17   Q. Okay.
18          And you disagreed with the
19   prosecutor's recommendation?
20   A. I disagreed with the finding.
21   Q. Do you know what the outcome was of those
22   ethics charges?
23   A. That there was nothing, you know, they
24   weren't going to proceed.

46

1    Q. How did you initiate those proceedings?
2    Procedurally where did you go?
3    A. Well, I looked online.
4          MR. HANNA: I'm going to object to
5    this entire line of questions, because I don't know
6    what relevance it is, but you can answer the
7    question.
8          MR. SHOEMAKER: Okay.
9          THE WITNESS: I looked online under --
10   I don't know whether I looked online, I can't
11   remember, or I called up the municipal division
12   manager and said I had a concern about and how do I
13   file a complaint, do I file it with her, and she
14   directed me to that agency that does that.
15   BY MR. SHOEMAKER:
16   Q. How about Judge Springman, what was the
17   nature of your ethics complaint against him?
18   A. The nature of the complaint was in one the
19   courtroom was overcrowded. There was too many
20   people in the courtroom. It was beyond capacity.
21   People were sitting behind me cursing at me and
22   nothing was being done by the police officer. They
23   were yelling out making belligerent comments about
24   me and he was dismissing cases that, where people

Cottrell and Holland vs. J&R Discount Liquor Gallery, Inc., et al                          Maryann Cottrell, 8/26/09

47

1   parked but they were like parked for 60 seconds or
2   something or 30 seconds, he felt it wasn't enough.
3      **Q.** And you disagreed with his interpretation of
4   the law?
5      **A.** Yes.
6      **Q.** And what came of those complaints, if you
7   know?
8      **A.** Nothing happened.  I also disagreed with him
9   keeping me there when my daughter was being dropped
10  off with nobody home.
11     **Q.** Now, with respect to the tickets you've
12  issued against the owners or operators of
13  businesses, how do you decide on any given day,
14  week or month who you're going to file tickets
15  against?
16     **A.** I don't do it that way.
17     **Q.** But that's sort of, it's going to be an
18  open-ended question, how do you do it?
19     **A.** I don't decide.  I'm out doing errands.  I'm
20  going from my house to the grocery store, whether I
21  have Brittany or I don't, I'm just driving by and
22  if I see a denial of access I document it.
23     **Q.** Let's use an example.  Let's say you're
24  driving to the grocery store.  Let's say you shop

49

1      **Q.** And by "document" you mean write down the tag
2   number if it's a car parked in an inappropriate
3   place?
4      **A.** No.  I videotape it.
5      **Q.** Videotape.  Have you always videotaped?
6      **A.** No.
7      **Q.** That's the current way of doing it?
8      **A.** Yes.
9      **Q.** Previously you would take photographs of
10  license plates?
11     **A.** Yes.
12     **Q.** And sometimes you would take a picture of the
13  rear-view mirror to show whether or not it would
14  have a placard?
15     **A.** Yes.
16     **Q.** And would you also write down the license
17  plate number as a backup so you could do a lookup?
18     **A.** I might.  I didn't write the number.  I had
19  the picture, but I could write it down.  I didn't
20  do it in every case, maybe an isolated case.
21     **Q.** Let's move to J&D Liquors.  The first ticket
22  you wrote, the first citizens complaints you
23  arranged to have issued related to, according to
24  the records I've been given, a violation date of

48

1   at Shop-Rite.  You're on your way to Shop-Rite and
2   you pass a Wawa.  You have absolutely no intention
3   of going to the Wawa because you just want to get
4   on your way to Shop-Rite, but you see somebody
5   without a placard parked in a handicapped spot.
6           In that situation would you stop at
7   the Wawa even though you're not going to patronize
8   Wawa and write up a ticket?  I mean, is that an
9   example of something?
10     **A.** I would stop at Wawa and document it, but I
11  also go to Wawa quite often to buy things.
12     **Q.** I'm trying to make a hypothetical to
13  understand how it is you do what you do.
14     **A.** If I'm going somewhere and I see a violation
15  I will document it.
16     **Q.** So it's not limited to places that you intend
17  to go to purchase or potentially purchase a product
18  or a service?
19     **A.** No, it's not limited.
20     **Q.** Sometimes it is, sometimes it isn't?  That's
21  fair?
22     **A.** It all depends on the circumstance.  If I'm
23  driving by and I see it usually I'm going to
24  document it.

50

1   April 10, 2006.  What caused you to be either at or
2   in the vicinity of J&D Liquors that day?
3      **A.** Okay.  My daughter's agency is around the
4   corner on Curtis Avenue.
5      **Q.** What's the name of the agency?
6      **A.** Independent Living.
7      **Q.** Okay.  Go on.  I interrupted.
8      **A.** And I dropped her off and sometimes I go
9   back, we go different ways home, but sometimes we
10  go through Broad and then what's that street.
11     **Q.** Red Bank?
12     **A.** Cooper.  We go back that way or we go past
13  J&D Liquor that way --
14     **Q.** Curtis --
15     **A.** -- past Broad Street.
16     **Q.** Curtis is on the other side of Cooper from
17  where J&D is; right?
18     **A.** Yes.  Like I said, here is Curtis.  You go
19  down Henry Street and I go to, that's Cooper.
20  Sometimes I go home that day.  Sometimes we go
21  home, we go back on, what's that, Broad Street, the
22  main street?
23     **Q.** Right.
24     **A.** And go home that way.

---

51

1   **Q.** On Red Bank? You make a right at the light
2   where the hospital is?
3   **A.** Yeah. You make a right where the McDonald's
4   is.
5   **Q.** Okay.
6       So on that particular day, April 10,
7   2006 what happened?
8   **A.** Well, we were driving by. The light was red
9   and I was the passenger and I saw that there was a
10  car parked in the handicapped space. There was no
11  tag on it and the license plate was not identified
12  to a handicapped individual.
13      So Richard dropped me off. I took the
14  video. I'm sorry. Strike that. I took pictures
15  and then we left.
16  **Q.** And you arranged for a ticket to be issued?
17  **A.** Several days later I went down and I signed
18  the ticket, gave them the information and the
19  ticket was issued, citizens complaint.
20  **Q.** It looks like you had the ticket issued the
21  same day; is that right?
22  **A.** I don't have the ticket in front of me.
23  **Q.** What kind of a camera did you use, digital or
24  film?

---

52

1   **A.** Digital.
2   **Q.** How do you develop digital pictures or how
3   did you do in 2006?
4   **A.** You stick the chip into your computer printer
5   and hit print and that's how it's done.
6   **Q.** All right.
7       Do you recall what the outcome of that
8   ticket was ultimately?
9   **A.** Yes, I do.
10  **Q.** What was the outcome?
11  **A.** It was dismissed.
12  **Q.** Why?
13  **A.** Because I gave the prosecutor -- it was a
14  conflict with the prosecutor. I gave him the
15  discovery and he failed to give it to defendant's
16  attorney.
17  **Q.** Was that the first appearance?
18  **A.** It wasn't at the first appearance. The first
19  appearance was Judge North excused himself because
20  the conflict was somebody from J&D Liquor and then
21  it got rescheduled to another judge and another
22  prosecutor because apparently somebody must be
23  connected with the town or with Judge North. I
24  don't know. I really don't.

---

53

1   **Q.** So that case was dismissed solely because
2   discovery wasn't produced?
3   **A.** That's correct.
4   **Q.** You're sure of that?
5   **A.** Yes.
6   **Q.** On the day that occurred were there any other
7   tickets against J&D?
8   **A.** I'm talking about the ticket against
9   Mr. Strout, the blue vehicle. Is that what one
10  you're referring to?
11  **Q.** Yes.
12  **A.** Yes.
13  **Q.** It was actually registered to J&D Liquors,
14  not Mr. Strout.
15  **A.** Well --
16  **Q.** Just to be clear.
17  **A.** Okay.
18  **Q.** On the day that occurred, April 10, 2006,
19  case was dismissed for lack of discovery, was the
20  court considering any other tickets issued against
21  J&D?
22  **A.** That day?
23  **Q.** Yes.
24  **A.** I don't recall. I don't know if the other

---

54

1   tickets were available that day to be heard. I
2   don't remember.
3   **Q.** According to the records provided to me by
4   the Woodbury Municipal Court three matters were
5   heard on the same day. One is the one we just
6   discussed from April of 2006, one from September of
7   2006 and one from October of 2006. I'm just
8   representing what the court records say.
9       Does that in any way refresh your
10  recollection of how many cases were considered that
11  day?
12  **A.** I know I signed a ticket on 9/27 and 10/13,
13  but I don't recall if that was the same day that
14  this ticket was heard.
15  **Q.** What ticket did you issue on 10/13?
16  **A.** It was against J&D Liquors, failure to
17  provide access and one of the vendors.
18  **Q.** Do you remember what occurred on the
19  violation date of September 27, 2006? Do you
20  remember what that ticket was about?
21  **A.** It was a violation of a delivery truck of a
22  vendor.
23  **Q.** I have been produced some photocopies of
24  photographs and some were actually marked, maybe

Cottrell and Holland vs. J&R Discount Liquor Gallery, Inc., et al                    Maryann Cottrell, 8/26/09

---

55

1  all of them were marked at prior depositions this
2  morning. They don't have dates on them.
3        Would you be able to look at those
4  photographs and tell me if any of those correspond
5  to the September 27 violation date?
6    **A.** I can't tell you because there is no date on
7  these photographs and --
8    **Q.** Do you have copies of photographs that do
9  have dates on them?
10   **A.** Yes.
11   **Q.** The ones that have been provided to me don't.
12       MR. HANNA: I know. I don't have
13  ones with dates on them either.
14       THE WITNESS: Sorry?
15       MR. HANNA: I don't have ones with
16  dates on them, so you'll have to get them to me and
17  we'll get them over to him.
18       THE WITNESS: Okay. Well, I sent them
19  through e-mail so I guess it doesn't -- I had no
20  idea that the date doesn't transpose through
21  e-mail.
22  BY MR. SHOEMAKER:
23   **Q.** When you save the pictures off your camera do
24  you title them based on the date in your electronic

---

56

1  file?
2    **A.** It's automatically done.
3    **Q.** Your camera does it?
4    **A.** Yes. It sets date and time.
5    **Q.** So if you were to look at your electronic
6  file on the computer, whether by right clicking or
7  otherwise, you would be able to tell what date a
8  photo was taken?
9    **A.** Yes, by right clicking. If I put my arrow to
10  the picture it will come up with the date and time.
11   **Q.** Okay.
12       So what I'm going to ask, and I can
13  follow up with your attorney, I'd like a set of
14  these same photographs with some sort of
15  designation as to the date.
16   **A.** Sure.
17   **Q.** Whether it be by Post-it note or reference to
18  exhibit number.
19   **A.** That's fine.
20   **Q.** You can do that relatively easily?
21   **A.** Yes.
22   **Q.** So we can't match up the picture to the date
23  of September 27, but do you remember the
24  circumstances? Was it a delivery truck?

---

57

1    **A.** They were delivery trucks.
2    **Q.** Do you remember what brand was on the side of
3  the truck?
4    **A.** It wasn't a Coca-Cola truck. It was either,
5  there is a Coors, a Bud Light and a Coors truck. I
6  don't know which one it was, though. I can't, to
7  be honest with you.
8    **Q.** What was it about the way the truck was
9  parked that you thought was improper?
10   **A.** It's blocking the path of travel and the
11  entryway into the primary source area which is the
12  entrance of the building itself.
13   **Q.** Did the prosecutor present that matter on
14  behalf of the state?
15   **A.** Did he present it to the judge?
16   **Q.** Yes.
17   **A.** Um, I don't believe -- I don't recall. Well,
18  I don't recall if there was a trial. If there was
19  no trial it was under his discretion.
20   **Q.** What does that mean, "under his discretion"?
21   **A.** I explained to him why I took the picture,
22  what the problem was. He doesn't agree with me, he
23  dismisses it, whether it's right or wrong.
24   **Q.** I'm not going to get into whether it's right

---

58

1  or wrong at this point, but the September 27, 2006
2  violation that you documented, was there a finding
3  by the judge of a dismissal or not guilty?
4    **A.** Either/or. I don't remember whether it was
5  not guilty or dismissal.
6    **Q.** But there was a trial on the merits?
7    **A.** I don't remember if there was a trial.
8    **Q.** Do you remember a trial about any of these
9  tickets?
10   **A.** I don't remember if there was a trial. I
11  don't recall.
12   **Q.** And that applies to each one of them so I
13  don't have to go one by one? You don't remember if
14  there was a trial on any of them?
15   **A.** There was no trial. I'm sure there wasn't.
16  I really can't -- I know there was no trial with
17  the stalking charges, disorderly conduct by one of
18  your defendant.
19   **Q.** That was Harry Trout.
20   **A.** Yeah.
21   **Q.** You both took the Fifth Amendment and they
22  washed out and were dismissed; right?
23   **A.** They were dismissed, yes.
24   **Q.** But setting that one aside, the remainder of

---

**ANDREA SEGAL REPORTING**

59

1  the tickets against you --
2  **A.** I don't remember whether it was a trial or
3  just dismissed. I don't.
4  **Q.** Were there any occasions where you filed any
5  sort of or caused to be filed any sort of ticket
6  against J&D Liquors where there was a finding or a
7  plea of guilty?
8  **A.** I don't think there was any guilty finding
9  for them at all.
10  **Q.** And no guilty plea; correct?
11  **A.** No guilty, no.
12  **Q.** Now, you were represented by Mr. Agre on the
13  date when there were the cross complaints for
14  harassment; right?
15  **A.** That's correct.
16  **Q.** And essentially there was a deal where you
17  and Mr. Trout would not testify against one another
18  so those charges were dismissed; correct?
19  **A.** Yes.
20  **Q.** Do you remember there being an agreement
21  between Mr. Agre and Mr. Cona, who represented J&D,
22  that in exchange for that deal you would not return
23  to the premises of J&D Liquors?
24  **A.** No, I don't remember that.

60

1  **Q.** I am going to show you what was marked at a
2  previous deposition as D. Strout-2 and you've seen
3  that letter before; is that right?
4  **A.** March 23rd, yes.
5  **Q.** And that's a March 23, 2007 letter from Chris
6  Cona, Esquire to Bob Agre, who was your attorney at
7  the time; correct?
8  **A.** Um-hum.
9  **Q.** I'm sorry. You have to say yes or no for the
10  court reporter.
11  **A.** Oh, yes.
12  **Q.** Thank you.
13  **A.** Sorry.
14  **Q.** Now, the beginning of the letter says,
15  "Pursuant to our court appearance on March 22, 2007
16  and our discussions, please make sure your client
17  knows that under no circumstances is she allowed on
18  J&D Liquors' property."
19       My question for you is, isn't that
20  sentence confirming a conversation between your
21  attorney and the J&D Liquors' attorney that part of
22  the deal that there would be no testimony and a
23  dismissal of the harassment charges was that you
24  would not return to J&D Liquors?

61

1  **A.** Yes.
2  **Q.** That was?
3  **A.** Yes.
4  **Q.** Okay. Am I correct that you did return to
5  J&D Liquors after that letter?
6  **A.** No.
7  **Q.** Did you return to the McDonald's property and
8  photograph or videotape the property of J&D
9  Liquors?
10  **A.** Yes.
11  **Q.** Was that only on one occasion? I see a
12  violation date of April 27, 2007. Does that sound
13  right?
14  **A.** Let's see. The first April date, that was
15  2006.
16  **Q.** Correct. I have a court notice here telling
17  me a ticket for obstruction was issued to J&D
18  Liquors, violation date April 27, 2007, ticket
19  issued almost one month later, May 23, 2007.
20       Does that sound right to you?
21  **A.** Yes.
22  **Q.** Can you identify if any of these photographs
23  were involved in that return trip in April of 2007?
24  **A.** No, I can't.

62

1  **Q.** Your attorney has advised me that he's either
2  in possession of or is aware of a videotape.
3       Does that videotape relate to the
4  April 2007 complaint?
5  **A.** I'm not sure.
6  **Q.** Do you remember when you started videotaping
7  instead of photographing?
8  **A.** No, I can't tell you the exact time.
9  **Q.** In any event, so you don't know if you took
10  photographs, videotape or both; is that accurate?
11  **A.** I don't have that information in front of me.
12  The photographs don't tell me what the dates were
13  and I can't -- I can't remember which date they
14  were taken.
15  **Q.** Do you remember if you were there personally?
16  **A.** Yes.
17  **Q.** You were?
18  **A.** Yes.
19  **Q.** And was Mr. Holland with you?
20  **A.** Yes.
21  **Q.** Do you and Mr. Holland generally travel
22  together as a rule?
23  **A.** Not necessarily.
24  **Q.** Let's say the images you took, we don't know

63

1  if they're pictures or video, let's call them
2  images, the images you took from the McDonald's
3  property; is that right?
4  **A.** Yes.
5  **Q.** Why did you choose to do that?
6  **A.** Because after the last -- after the stalking
7  incident with Harry Trout I decided to take it from
8  McDonald's.
9  **Q.** Did your receipt of the March 23 letter play
10  into your decision at all?
11  **A.** I believe that the violation was before that,
12  but way before that.
13  **Q.** What violation?
14  **A.** Well, the charges against Mr. Trout.
15  **Q.** Were well before that letter, correct. The
16  March 23, 2007 letter came just after your court
17  appearance on the Trout matter; right?
18  **A.** Okay, yes.
19  **Q.** I think that's self-explanatory. The letter
20  talks about the court appearance.
21      Had you received a copy of the March
22  23 letter before you took images on April 27, 2007?
23  It's about a month after the date of the letter.
24  **A.** Did I receive -- I guess within that 30 days.

64

1  I received this shortly after.
2  **Q.** And in any event you knew that part of the
3  deal, the plea deal for the Trout matter was you
4  wouldn't return anyway, so even if you hadn't
5  received the letter you were aware of that?
6  **A.** When I received the letter that was
7  notification.
8  **Q.** Aside from J&D Liquors, what other property
9  owners or managers have either banned you from
10  their properties or somehow indicated to you that
11  would file trespassing or harassment complaints if
12  you came on to their property?
13  **A.** Bob's Little Gun Shop, Heritage's, Lucia's
14  Bakery, Pat's Pizza.
15  **Q.** Which one?
16  **A.** It's in Woodbury Heights.
17  **Q.** On Woodbury Glassboro Road?
18  **A.** Um-hum, yes. Yes. Sorry about that.
19  **Q.** You learned.
20  **A.** Rowan University, but that's been lifted.
21  **Q.** Any car dealerships?
22  **A.** Woodbury Nissan. Second Chance Auto,
23  Campbell Heating, Monroe Tire, Auto Magic, The
24  Landmark, Glassboro Public Schools, The Founders Inn.

65

1  That's all I can remember right now.
2  **Q.** Did each of those businesses advise you in
3  writing of what they wanted to happen or didn't
4  want to have happen?
5  **A.** In writing or direct communication.
6  **Q.** The direct communication meaning face-to-face
7  verbal?
8  **A.** Yes.
9  **Q.** How many of those were in writing?
10  **A.** I would have to go down each and every one of
11  them. Is that what you want to do?
12  **Q.** Well, I'll go through them so you don't have
13  to remember them in order.
14      Bob's Little Gun Shop?
15  **A.** Writing.
16  **Q.** Heritage's?
17  **A.** Writing.
18  **Q.** Lucia's Bakery?
19  **A.** I believe that was writing. I'm trying to
20  recall from memory. I believe it was writing.
21  **Q.** Pat's Pizza?
22  **A.** Verbal.
23  **Q.** Rowan? Oh, that one is lifted. Okay.
24      Woodbury Nissan?

66

1  **A.** Writing.
2  **Q.** Second Chance Auto?
3  **A.** In court.
4  **Q.** So it was verbal?
5  **A.** Yes.
6  **Q.** Campbell Heating?
7  **A.** Verbal.
8  **Q.** Is that off of Kings Highway, Campbell
9  Heating?
10  **A.** I don't know if that's the name of the
11  street. It's on the way to West Deptford.
12  **Q.** Monroe Tire?
13  **A.** Verbal.
14  **Q.** Auto Magic?
15  **A.** Writing.
16  **Q.** Landmark Americana?
17  **A.** Writing.
18  **Q.** Glassboro Public Schools?
19  **A.** Writing.
20  **Q.** And Founders Inn?
21  **A.** In court, verbal.
22  **Q.** Now, you have filed suit against some but not
23  all of those entities; correct?
24  **A.** Yes.

Cottrell and Holland vs. J&R Discount Liquor Gallery, Inc., et al      Maryann Cottrell, 8/26/09

67

1   **Q.** How did you decide which to sue and which not
2 to sue?
3   **A.** It was time.
4   **Q.** What does that mean?
5   **A.** Statute of limitation time. I didn't make a
6 decision on which. They all violated my rights.
7   **Q.** What do you understand the statute of
8 limitations to be if you have any understanding at
9 all?
10        MR. HANNA: Objection. Go ahead. Go
11 ahead, you can answer the question.
12        THE WITNESS: I can answer?
13        MR. HANNA: Yes.
14        THE WITNESS: It is my understanding
15 there is a time period you can file a suit against
16 someone else.
17 BY MR. SHOEMAKER:
18   **Q.** I don't mean to quiz you on legal matters,
19 but do you know what the time frame is to file a
20 claim?
21   **A.** It depends what claim it is and I'm not sure
22 on all claims.
23   **Q.** Okay. But your decision to not sue certain
24 of these entities, was it based on statute of

68

1 limitations grounds?
2   **A.** It's based upon resources, to be honest with
3 you.
4   **Q.** Time?
5   **A.** Time.
6   **Q.** Woodbury Nissan, were they one of the
7 entities you've settled against?
8   **A.** Yes.
9   **Q.** And are the terms of that settlement
10 confidential by agreement?
11        MR. HANNA: Yes.
12        MR. SHOEMAKER: Okay.
13 BY MR. SHOEMAKER:
14   **Q.** Now, the reasons behind instructions not to
15 go to these various properties I would imagine
16 varies a little bit from case to case, but as a
17 general matter do they all relate to your writing
18 of parking tickets or tickets of some nature?
19   **A.** It relates to me documenting a violation of
20 the business.
21   **Q.** A violation relating to ADA accessibility or
22 something similar; is that right?
23   **A.** It could be a multiple. It could be an ADA
24 violation. It could also be a parking violation.

69

1   **Q.** I just want to make sure there is not some
2 other category of things I'm not aware of. So they
3 all have to do with ADA violations, parking
4 tickets, things of that nature?
5   **A.** Correct, yes.
6   **Q.** Are you aware of any county charges being
7 filed against you for perjury?
8   **A.** No.
9        Do you have the time?
10   **Q.** I think I may come in right under the wire.
11        You're not aware of any county charges
12 being filed against you for perjury?
13   **A.** There are no county charges filed against me.
14   **Q.** How do you know that? You say that with a
15 lot of confidence.
16        How do you know that?
17   **A.** Because I inquired about it.
18   **Q.** When?
19   **A.** I spoke to Mr. Steve Sands because I saw it
20 on the screen, plus I know about the charges to
21 begin with. They've been dismissed.
22   **Q.** So Steve Sands is a prosecutor?
23   **A.** Yes.
24   **Q.** When did you speak to Steve?

70

1        MR. HANNA: And I object to this line
2 of questioning. Go ahead and answer.
3        THE WITNESS: Shortly after the case
4 was finished because it was remanded back to
5 Municipal Court. Shortly after the case was
6 dismissed I was checking on the computer down in
7 the county, criminal case management.
8 BY MR. SHOEMAKER:
9   **Q.** PROMIS/GAVEL?
10   **A.** Yes.
11   **Q.** Okay.
12   **A.** And it was on there. I questioned him, if
13 this was remanded down there, why is it still on
14 there, and he said eventually it would come off,
15 but --
16   **Q.** It sounds like you're referring to a single
17 entry on PROMIS/GAVEL. Am I accurate in that?
18   **A.** I'm just going by what I saw on the screen.
19 I don't know if there was multiple.
20   **Q.** Did you see one entry or more than one entry?
21   **A.** I just saw one entry.
22   **Q.** I have sent this to your attorney already,
23 and it's not a trick, I found several.
24   **A.** I'm not aware of that.

---

**71**

1 **Q.** Okay. All were remanded to Municipal Court.
2 So you've answered the question. You're not aware
3 of any county charges for perjury?
4 **A.** I'm not, no.
5 **Q.** Are you aware of any situations where charges
6 originally filed as county charges were remanded to
7 Municipal Court?
8 **A.** I'm only aware of one charge.
9 **Q.** What was that situation?
10 **A.** That was where I had charged tenants of a
11 rental and I charged the landlord for disorderly
12 house and as a counterclaim he said he wasn't
13 running a disorderly house, that what I was saying
14 wasn't true, and he filed those charges on me.
15 **Q.** Okay.
16             And once remanded what happened to the
17 charge?
18 **A.** They were dismissed.
19 **Q.** Do you remember what township?
20 **A.** That was in Glassboro.
21 **Q.** Are you aware of any county charges for
22 perjury leveled against Mr. Holland?
23 **A.** No.
24 **Q.** Have you ever been convicted of a felony?

---

**72**

1 **A.** No.
2 **Q.** Ever charged with a felony?
3 **A.** No, I don't believe I have.
4 **Q.** Okay.
5             How about Mr. Holland?
6 **A.** Mr. Holland was charged with a felony, but he
7 was never convicted.
8 **Q.** We're talking about the case that went to the
9 Supreme Court? Is that what you're referring to?
10 **A.** Right. It was --
11 **Q.** I'm aware of that one.
12 **A.** It was thrown out, yes.
13 **Q.** I'm aware of that one.
14             Are you aware of any felony charges
15 aside from the case that resulted in the Supreme
16 Court decision?
17 **A.** I don't know about any other case.
18 **Q.** Okay.
19             Have you ever shopped at J&D Liquors?
20 **A.** No.
21 **Q.** Have you ever been inside the store?
22 **A.** No.
23 **Q.** Has Mr. Holland --
24 **A.** Yes.

---

**73**

1 **Q.** -- to your knowledge?
2 **A.** Yes.
3 **Q.** Okay. When?
4 **A.** Several years ago.
5 **Q.** How do you know that?
6 **A.** By him telling me.
7 **Q.** What do you mean by "several"? Was it after
8 the year 2000?
9 **A.** No. He just said when he used to go visit
10 friends in the area to watch games or go to games
11 he would stop by and make a purchase.
12 **Q.** So would I be correct on none of the
13 occasions that resulted in the tickets you had
14 issued against J&D Liquors were you ever on the
15 property for the purchase of patronizing the store?
16 **A.** No.
17 **Q.** You were not and I am correct?
18 **A.** Sorry?
19 **Q.** I think I asked the question in a confusing
20 way. Let me start over.
21             Was it your intention to patronize J&D
22 Liquors on any of the occasions where you were on
23 site and caused tickets to be issued?
24 **A.** On those dates, no.

---

**74**

1 **Q.** Do you know if Mr. Holland intended to
2 patronize J&D Liquors on any of those dates?
3 **A.** I don't know.
4 **Q.** Your daughter was not with you on any of
5 those dates?
6 **A.** Let's see. No.
7 **Q.** Do you drink alcohol on occasion?
8 **A.** Yes.
9 **Q.** About how often?
10 **A.** It depends. Maybe once a week and it could
11 be more than that if I'm invited or having a party
12 or going to somebody's house.
13 **Q.** Your daughter doesn't drink --
14 **A.** She can't.
15 **Q.** -- alcohol?
16 **A.** She doesn't drink alcohol, but they do sell
17 soda and other things there.
18 **Q.** Understood.
19             Do you know what Interrogatories are?
20 **A.** Yes.
21 **Q.** In your Answers to the Interrogatories I
22 served on your attorney you made mention of
23 interactions, that was your word, interactions with
24 David Strout. He's the president and fifty percent

---

| 75 | 77 |
|---|---|
| 1  owner of J&D Liquors. | 1  discovery or he never saw discovery and he did see |
| 2      What interactions are you referring | 2  the discovery the day that we were at the court. |
| 3  to? | 3  He saw it and he actually had it in his hand and |
| 4  **A.** Well, you have to read the question, sir. | 4  was looking at it, and that's, you know, that he |
| 5  **Q.** Okay.  My question was -- | 5  had no knowledge of what was going on and why this |
| 6  **A.** The question that I answered. | 6  was parked there and the whole thing. |
| 7  **Q.** Okay.  I'm going to tell you what the | 7  **Q.** Was this -- I'm sorry. |
| 8  question was. | 8  **A.** And he didn't know anything about discovery |
| 9      I asked why did you name David Strout | 9  at all and all that. |
| 10  individually, and your answer was, "The factual | 10  **Q.** Were these words directed to you or the |
| 11  basis for my belief that defendant David Strout | 11  prosecutor and the court? |
| 12  aided and abetted in defendant's retaliation | 12  **A.** He just said it. |
| 13  against me is drawn from my interactions with him." | 13  **Q.** Okay. |
| 14  **A.** Can I just see that? | 14      I'm just trying to find out if there |
| 15  **Q.** Sure (handing). | 15  is any conversation between you. |
| 16      MR. SHOEMAKER:   Off the record. | 16  **A.** I was talking to the prosecutor.  I mentioned |
| 17      (Discussion held off the record.) | 17  that he did see the discovery and I don't know |
| 18      THE WITNESS:  Okay. | 18  whether he directed that -- I'm sure he directed it |
| 19  BY MR. SHOEMAKER: | 19  to me, but if not me it was to everyone or -- |
| 20  **Q.** In your Interrogatory Answer for No. 15 | 20      MR. HOLLAND: It's 14 after 3:00. |
| 21  what are you referring to when you talk about your | 21      MR. HANNA:  It's going to be rough. |
| 22  interactions with David Strout? | 22  If you have further questioning maybe we should |
| 23  **A.** That would be the court appearance.  That | 23  adjourn this. |
| 24  would be the interaction. | 24      MR. SHOEMAKER:   I don't. |

| 76 | 78 |
|---|---|
| 1  **Q.** Okay. | 1      MR. HANNA:  You're done? |
| 2      Did you have any sort of conversation | 2      MR. SHOEMAKER:  I told you I'd come |
| 3  with Mr. Strout at the court appearance? | 3  in under the wire. |
| 4  **A.** No.  The interaction is the court proceeding | 4      MR. HANNA:  Okay. |
| 5  and then I believe in the video, Mr. Strout is in | 5      MR. HOLLAND:  You are under the wire, |
| 6  the video. | 6  absolutely.  Terrific. |
| 7  **Q.** Do you know the difference between David | 7      MR. HANNA:  I'd like to have the |
| 8  Strout and Harry Trout? | 8  opportunity to ask a few redirect questions. |
| 9  **A.** Yes, I definitely do. | 9      MR. SHOEMAKER: Okay. |
| 10  **Q.** Okay.  Their names are similar, which is why | 10  BY MR. HANNA: |
| 11  I ask. | 11  **Q.** I'm going to take you back to the court |
| 12  **A.** I know. | 12  appearance, the court experience that you had with |
| 13  **Q.** So you believe that David Strout is in the | 13  the cross charges with you and Mr. Trout is his |
| 14  video? | 14  name, right, and did you ever tell your attorney -- |
| 15  **A.** I believe so. | 15  who was your attorney in that case? |
| 16  **Q.** Would that have been the last ticket? | 16  **A.** Mr. Agre. |
| 17  **A.** Yes. | 17  **Q.** Did you ever tell Mr. Agre that you were |
| 18  **Q.** Do you remember what David Strout is doing in | 18  willing to refrain from going on J&D Liquors' |
| 19  the video? | 19  property in exchange for dropping charges against |
| 20  **A.** No, I don't remember. | 20  Mr. Trout? |
| 21  **Q.** Did you and Mr. Strout at any time exchange | 21  **A.** No. |
| 22  words even if it was one-sided? | 22  **Q.** And did you walk out of the courtroom that |
| 23  **A.** I don't remember.  I don't recall.  It might | 23  day understanding that you were banned from their |
| 24  have been something where he said he never got the | 24  premises? |

| 79 | 81 |
|---|---|
| 1  **A.** No. | 1  wouldn't come on the property. |
| 2  **Q.** When was the first time that you learned that | 2  **Q.** Correct. |
| 3  you were no longer permitted on the premises? | 3  **A.** That's not true. That's not true. My |
| 4  **A.** When I got written notification. | 4  attorney did not say that to me. |
| 5  MR. HANNA: Okay. That's it. | 5  **Q.** Pursuant to the discussions between your |
| 6  MR. SHOEMAKER: Now I'm going to need | 6  attorney -- |
| 7  another minute. I'll make it quick. | 7  **A.** That's what his attorney says. That's not |
| 8  BY MR. SHOEMAKER: | 8  what my attorney says. |
| 9  **Q.** I showed you this letter D. Strout-2. | 9  MR. HANNA: Let him finish his |
| 10  Remember we looked at that letter? | 10  question. |
| 11  **A.** Yes. | 11  THE WITNESS: Okay. |
| 12  **Q.** And that was the letter that immediately | 12  BY MR. SHOEMAKER: |
| 13  followed the court appearance where you had cross | 13  **Q.** Did you ever issue instructions for Mr. Agre |
| 14  charges between you and Mr. Trout; correct? | 14  to respond to Mr. Cona's letter and say I didn't |
| 15  **A.** Yes. | 15  agree to that? |
| 16  **Q.** And the letter confirms discussions between | 16  **A.** No. |
| 17  Attorney Cona and Attorney Agre that he was to make | 17  **Q.** Why not? If you didn't agree to it why |
| 18  sure your client, meaning you, knew that under no | 18  didn't you respond? |
| 19  circumstances were you allowed on J&D Liquors' | 19  **A.** To be quite honest with you, I just thought |
| 20  property. That's what the letter says; right? | 20  it was something that Mr. Cona just typed up, you |
| 21  **A.** That's what the letter says, yes. | 21  know. |
| 22  **Q.** Right. | 22  **Q.** Is there any significance to your mind when |
| 23  So am I correct that your attorney and | 23  attorneys write to one another and confirm an |
| 24  Mr. Cona had an agreement tied to the plea deal | 24  agreement or a discussion? Is there any |

| 80 | 82 |
|---|---|
| 1  that if you two dismissed your charges that you | 1  significance to that to you? |
| 2  agreed you would not come back to J&D Liquors' | 2  **A.** There is a significance because this attorney |
| 3  property and that's why you stood on McDonald's | 3  had denigrated me in court. |
| 4  property to take your video? | 4  **Q.** Who? |
| 5  **A.** No, that's not true. | 5  **A.** Mr. Cona. |
| 6  **Q.** Okay. So you're changing your testimony that | 6  **Q.** What significance is there to that? |
| 7  you just gave me -- | 7  **A.** Because this is what he's saying that |
| 8  **A.** I'm not changing my testimony. | 8  transpired to my attorney. I have received no |
| 9  **Q.** -- a half an hour ago? | 9  notification confirming from my attorney that this |
| 10  **A.** You're saying that's part of this, that was | 10  happened. |
| 11  part of the settlement. That's not true. | 11  MR. SHOEMAKER: Okay. That's all. |
| 12  **Q.** What is true then? | 12  MR. HANNA: Okay. I would like to |
| 13  **A.** That I was not notified until I got the | 13  redress. |
| 14  letter in the mail. | 14  BY MR. HANNA: |
| 15  **Q.** That the agreement was in place between the | 15  **Q.** Do you know, were you there for the |
| 16  attorneys? | 16  discussions between your attorney and Mr. Cona? |
| 17  **A.** No, that I was not allowed to come on the | 17  **A.** No. |
| 18  property. | 18  **Q.** So you don't actually have any firsthand |
| 19  **Q.** Okay. | 19  knowledge of what the discussion was; is that |
| 20  Tell me if I'm reading this letter | 20  correct? |
| 21  wrong. This letter is a confirmation between | 21  **A.** That's true. |
| 22  Mr. Agre and Mr. Cona -- | 22  **Q.** And when you received that letter did you |
| 23  **A.** You said that's part of the -- you're saying | 23  initially read that letter as there being an |
| 24  that in order for the charges to be dropped that I | 24  agreement between your attorney and his attorney? |

Case 1:08-cv-05418-NLH-KMW   Document 18-1   Filed 01/05/10   Page 24 of 24 PageID: 209

Cottrell and Holland vs. J&R Discount Liquor Gallery, Inc., et al                    Maryann Cottrell, 8/26/09

83

1   **A.** No.

2   **Q.** How did you read that letter?

3   **A.** I read it as something that Mr. Cona put on

4   the paper.  I really didn't have any trust in what

5   he said there because I had no confirmation from my

6   attorney.

7   **Q.** But did you read that as at least being

8   plausibly read as a deal being made between your

9   attorney and --

10  **A.** No, because that's not how we agreed it.

11  **Q.** When did it first occur to you that there

12  could be a deal, that that could be read as a deal?

13  **A.** Today.

14  **Q.** When?

15  **A.** I -- this is what he's saying that, his

16  interpretation of the letter.

17  **Q.** And that's the first time that you've ever

18  interpreted the letter that way?

19  **A.** That's right.

20          MR. HANNA:  Okay.  That's all.

21      (Witness excused.)

22              - - -

23      (Deposition concluded at 3:19 p.m.)

24

84

1       CERTIFICATE

2

3       I HEREBY CERTIFY that the proceedings,

4   evidence and objections are contained fully and

5   accurately in the stenographic notes taken by me upon

6   the foregoing matter on Wednesday, August 26, 2009,

7   and that this is a true and correct copy of same.

8

9

10      _____
        Donna A. Bittner, RMR-CRR, CSR(NJ)

11

12

13      (The foregoing certification of this

14  transcript does not apply to any reproduction of the

15  same by any means, unless under the direct control

16  and/or supervision of the certifying reporter.)

17

18

19

20

21

22

23

24