# EXHIBIT E



1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2                        (CAMDEN)
                         - - -
 3      MARYANN COTTRELL and     :   Civil Docket
        RICHARD HOLLAND          :   No. 08cv-5418 (NLH)
 4              Plaintiffs,      :
                                 :
 5         vs.                   :
        J&R DISCOUNT LIQUOR      :
 6      GALLERY, INC., d/b/a     :
        J&R LIQUORS; and DAVID   :
 7      J. STOUT, JR.            :
                Defendants.      :
 8

 9                       - - -

10            West Berlin, New Jersey
              Wednesday, August 26, 2009
11                       - - -

12

13            Deposition of DAVID J. STROUT, JR.,

14      taken pursuant to notice, at the law offices of

15      Friedman Doherty, LLC, 125 North Route 73, West

16      Berlin, New Jersey, on the above date, beginning at

17      10:04 a.m., before Donna A. Bittner, RMR-CRR.

18                       - - -

19

20

21                ANDREA SEGAL REPORTING
22                122 Country Farms Road
                 Marlton, New Jersey  08053
23                  (856) 596-1763

24
```

2

 1   APPEARANCES:

 2            WESLEY G. HANNA, ESQUIRE
             Friedman Doherty, LLC
 3             125 North Route 73
               West Berlin, New Jersey  08091
 4
                 Counsel for Plaintiffs
 5
             MARK B. SHOEMAKER, ESQUIRE
 6           Ward Shoemaker LLC
               36 Euclid Street
 7             Woodbury, New Jersey  08096

 8               Counsel for Defendants

 9
     ALSO PRESENT:
10

11           HARRY E. TROUT

12
                         - - -
13

14

15

16

17

18

19

20

21

22

23

24

Case 1:08-cv-05418-NLH-KMW   Document 18-5   Filed 01/05/10   Page 4 of 31 PageID: 243
Cottrell and Holland vs. J&R Discount Liquor Gallery, Inc., et al

David J. Strout, Jr., 8/26/09

---

**3**

1

2   WITNESS:                    I N D E X          PAGE

3   DAVID J. STROUT, JR.

4        By Mr. Hanna --------------- 4

5          - -

6   EXHIBITS     DESCRIPTION        PAGE

7   D Strout 1   Letter dated Nov. 3, 2006 - 16

8   D Strout-2   Letter dated March 23, 2007 17

9   D.Strout-3   Copy of photograph -------- 34

10  D.Strout-4   Diagram ----------------- 34

11  D.Strout-5   Copy of photograph -------- 72

12  D.Strout-6   Copy of photograph -------- 73

13  D.Strout-7   Color copy of photograph -- 77

14  D Strout-8   Color copy of photograph   77

15  D.Strout-9   Copy of photograph -- ---- 79

16  D Strout 10  Copy of photograph -------- 82

17  D Strout 11  Copy of photograph   ------ 84

18  D.Strout-12  Copy of photograph -------- 87

19  D.Strout-13  Copy of photograph -------- 92

20  D Strout 14  Color copy of photograph -- 95

21  D.Strout-15  Color copy of photograph -- 97

22  D.Strout-16  Copy of photograph ------- 100

23  D Strout 17  Copy of photograph ------- 101

24  D.Strout-18  Copy of photograph ------- 103

---

**4**

1        (It is hereby stipulated and agreed by

2   and between counsel for the respective parties that

3   signing, sealing, filing and certification are

4   waived; and that all objections, except as to the

5   form of the question, are reserved until the time of

6   trial.)

7          - - -

8        ...DAVID J. STROUT, JR., 1345 Royal Lane,

9      West Deptford, New Jersey, 08086, after having

10     been duly sworn, was examined and deposed as

11     follows...

12          - - -

13  BY MR. HANNA:

14  **Q.** What is your full name?

15  **A.** David J. Strout, Jr.

16  **Q.** Okay. Can you spell that?

17  **A.** S-T-R-O-U-T.

18  **Q.** What is your date of birth?

19  **A.** 5/19/69.

20  **Q.** I'm going to ask you a series of questions

21  and even though this is an informal setting, you

22  are under oath. You have the same obligation to

23  tell the truth and the whole truth as if you were

24  in a court of law.

---

**5**

1        Do you understand that?

2   **A.** Yes.

3   **Q.** If I ask you a question that you don't

4   understand, I want you to tell me that you don't

5   understand the question.

6        Do you agree to that?

7   **A.** Sure.

8   **Q.** Okay. Now, the nature of the transcript

9   requires that we both follow a few ground rules.

10  First we have to wait until one another is done

11  talking before the other one can begin talking,

12  therefore I have to ask that you only start

13  answering a question when I'm through asking the

14  question.

15        Is that okay?

16  **A.** Okay.

17  **Q.** And likewise if you're not done answering the

18  question or have more to add and I start the next

19  question I want you to stop me so you can finish

20  your answer.

21        Is that okay?

22  **A.** Okay.

23  **Q.** And finally if I ask you a yes or no

24  question, you have to answer with the word yes or

---

**6**

1   no. The court reporter can't transcribe a nod, a

2   gesture or an um-hum, um-um, so you have to say yes

3   or no.

4        Is that okay?

5   **A.** Fine.

6   **Q.** Do you know of any reason why you would not

7   be able to testify to the best of your recollection

8   today, whether it be a medical condition or maybe

9   you know, medicine that you took?

10  **A.** No.

11  **Q.** And you are appearing today on behalf of J&D

12  Liquors?

13  **A.** Yes.

14  **Q.** And you're also appearing in your personal

15  capacity as well?

16  **A.** Yes.

17  **Q.** So if you're going to answer a question

18  strictly in your personal capacity you have to let

19  me know. Okay? And if you're going to answer a

20  question strictly as to J&D Liquors you have to let

21  me know that as well.

22        Is that okay?

23        MR. SHOEMAKER:   I would note if

24  that's possible. That's going to depend on the

---

---

**7**

1  nature of your question.

2        MR. HANNA:  Of course.

3        MR. SHOEMAKER:  I think in fairness

4  if you want him to answer only in one capacity or

5  the other you should try to let him know that's

6  what you want.

7        MR. HANNA: Of course.  Is that okay?

8        THE WITNESS:  Fine.

9  BY MR. HANNA:

10  **Q.** Could you describe your involvement with J&D

11  Liquors?

12  **A.** I am the president and fifty percent owner.

13  **Q.** So if there is upper management, you're upper

14  management with J&D Liquors?

15  **A.** Correct, yes.

16  **Q.** And how would you describe J&D Liquors'

17  customer base?

18  **A.** I don't understand your question.

19  **Q.** Well, okay.  Who is your target market?

20  **A.** The public, someone that consumes alcohol.

21  **Q.** Got you.

22        Do you have a lot of regulars?

23  **A.** Yes.

24  **Q.** Okay.  Occasional customers?

---

**8**

1  **A.** Yes.

2  **Q.** Would you say you have more regulars or more

3  occasional customers?

4  **A.** I don't know the answer to that.

5  **Q.** From your regulars do you know where your

6  customer pool is being drawn from?  I mean, are

7  they locals?

8  **A.** I don't know where they live.

9  **Q.** Do you ever have pedestrians cut through your

10  parking lot?

11  **A.** Yes.

12  **Q.** Okay.  And do you have any people who

13  regularly cut through the parking lot?

14  **A.** Not that I'm aware of.

15  **Q.** Okay.

16        What is your -- do you guys have a

17  rest room in J&D Liquors?

18  **A.** Yes.

19  **Q.** Do you allow members of the public to use it

20  if they ask?

21  **A.** No.

22  **Q.** Do you ever make an exception to that policy

23  for a customer that you wouldn't make for a

24  noncustomer?

---

**9**

1  **A.** No.

2  **Q.** How would you treat a person who came in off

3  the street or a motorist passing by that came in

4  solely for the purpose of using the rest room?

5        MR. SHOEMAKER:  Objection to the

6  form.  You can answer.

7        THE WITNESS:  I would tell them we

8  don't have a public rest room.

9  BY MR. HANNA:

10  **Q.** So have you ever had somebody walk in and ask

11  to use the rest room, to the best of your

12  knowledge?

13  **A.** Yes.

14  **Q.** And they weren't a customer, they were just

15  coming in to ask to use the rest room?

16  **A.** I've had both.

17  **Q.** How would your employees deal with a motorist

18  who entered your premises without any intention of

19  buying anything and asked you, you know, or an

20  employee or fellow patron for directions because

21  they were lost?

22        MR. SHOEMAKER:  Objection to form.

23  You can answer if you have personal knowledge about

24  it.  He asked you questions about what your

---

**10**

1  employees would do.

2        THE WITNESS:  Can you repeat the

3  question, please?

4  BY MR. HANNA:

5  **Q.** How would you -- let me ask you this.  Do you

6  have interaction with your customers?

7  **A.** Yes.

8  **Q.** Okay.  Do you ever work the store?

9  **A.** On occasion.

10  **Q.** Okay.  So how would you, how would you deal

11  with a motorist who entered your premises without

12  any intention of buying anything and asked you or a

13  fellow patron or an employee who was in front of

14  you, right, for directions because they were lost?

15        MR. SHOEMAKER:  Objection to form.

16  You can answer.  It's a multi-part question, but

17  you can answer.

18        THE WITNESS:  If I were asked for

19  directions and I knew the directions I would

20  provide them with the directions.

21  BY MR. HANNA:

22  **Q.** Has anything like that ever happened, to the

23  best of your knowledge?

24  **A.** Yes.

---

11

1  **Q.** How would you handle it if an individual came
2  into your store without any intention of purchasing
3  anything because he had just witnessed somebody
4  breaking the law and he wanted to use your
5  telephone?
6      MR. SHOEMAKER: You're asking him what
7  he would do as opposed to whether there is some
8  sort of policy or procedure in the store?
9      MR. HANNA: I'm asking what you would
10 do if you were manning the store.
11     MR. SHOEMAKER: Okay. Thank you.
12     THE WITNESS: I would call the police
13 myself.
14 BY MR. HANNA:
15 **Q.** Do you have a policy with regards to that for
16 your employees?
17 **A.** Not a written policy.
18 **Q.** And has anything like that ever happened?
19 **A.** Yes, we've called the police for accidents.
20 **Q.** Okay.
21 **A.** I don't recall any phone calls for a crime.
22 **Q.** What do you mean an accident? What do you
23 mean by an accident?
24 **A.** A car accident.

12

1  **Q.** Where would the car accident, where did the
2  car accident take place?
3  **A.** Usually pulling in our lot.
4  **Q.** How would you handle it if there was an
5  automobile accident or a crime or some other
6  incident in front of your store or maybe somebody
7  pulling into your parking lot and a person came on
8  to the lot for the sole purpose of taking a handful
9  of pictures of a car involved in the scene or the
10 incident?
11 **A.** That would be up to the police because if
12 there was an incident of that nature I would have
13 called the police and they would take over the
14 scene.
15 **Q.** Suppose they came back the next day and they
16 want to take some pictures.
17 **A.** I would -- I would ask them to leave. I
18 would not care, you know, unless they had an
19 attorney or the police with them.
20 **Q.** Okay. So you --
21 **A.** I would call the police again.
22 **Q.** And what would be the purpose of calling the
23 police?
24 **A.** Because I don't know who this person is, I

13

1  don't know why they're taking pictures on my lot.
2  It makes my customers uncomfortable.
3  **Q.** Has anything like that ever happened?
4  **A.** No.
5  **Q.** You said that you've seen accidents and cars
6  pulling in and out of your lot? That's what you --
7      MR. SHOEMAKER: Objection to form. I
8  don't know that he said he saw the accidents.
9      MR. HANNA: Okay. I strike that.
10 BY MR. HANNA:
11 **Q.** You were aware that accidents have occurred
12 from cars pulling in and out of your lot?
13 **A.** Yes.
14 **Q.** Okay.
15     Why do you believe that cars get into
16 accidents pulling in and out of your lot?
17     MR. SHOEMAKER: Objection to form.
18 You can answer.
19     THE WITNESS: I don't know. I guess
20 it's not my -- you'd have to ask the driver.
21 BY MR. HANNA:
22 **Q.** Do cars ever pull into the lot, to the best
23 of your knowledge, do cars ever pull into the lot
24 fast?

14

1  **A.** I don't know. I mean, I don't watch their
2  speed and I don't have a window at the, that I
3  would see it.
4  **Q.** Have you ever seen cars pulling in and out of
5  the parking lot?
6  **A.** Yes.
7  **Q.** Have you ever seen a car, say, whipping into
8  the parking lot from the road?
9      MR. SHOEMAKER: Objection to form.
10 You can answer.
11     THE WITNESS: No.
12 BY MR. HANNA:
13 **Q.** What road are you on?
14 **A.** Route 45.
15 **Q.** And Route 45, how many lanes is Route 45 in
16 each direction?
17 **A.** Four.
18 **Q.** So it's two?
19 **A.** Two in each direction.
20 **Q.** Two in each direction.
21     Have you ever seen anybody pull into
22 your parking lot, make a speedy entrance trying to
23 get across the two lanes of 45?
24     MR. SHOEMAKER: Objection to form.

Case 1:08-cv-05418-NLH-KMW   Document 18-5   Filed 01/05/10   Page 7 of 31 PageID: 246
Cottrell and Holland vs. J&R Discount Liquor Gallery, Inc., et al
David J. Strout, Jr., 8/26/09

## 15

1  THE WITNESS: No, not speeding.
2  BY MR. HANNA:
3  **Q.** How would you describe it?
4  **A.** I have seen people make that turn.
5  **Q.** Now, you've had, you testified that you've
6  had people come into your store for the purpose of
7  asking you to use the rest room without making any
8  purchases; is that correct?
9  **A.** That is correct.
10  **Q.** And you've also testified that you've had
11  people enter your store either asking you to use
12  the telephone or seeking to make a phone call of
13  some kind because they witnessed a crime; is that
14  correct?
15  **A.** No.
16  **Q.** No?
17  **A.** You asked me if I witnessed an accident.
18  **Q.** Okay. And you have witnessed accidents?
19  **A.** No, I have had people come into the store and
20  ask to use the phone because of an accident. I
21  have not had people come into the store to ask to
22  use the phone due to a crime.
23  **Q.** And the people who came into the store to ask
24  to use the phone because of the accident, those

## 16

1  individuals were not there to purchase liquor or
2  lottery tickets or cigarettes?
3  **A.** I don't know that. I don't recall that.
4  **Q.** Were any of those people ever banned for life
5  from your premises?
6  **A.** For asking to use the telephone?
7  **Q.** Yes.
8  **A.** No.
9  **Q.** How about for asking to use the rest room?
10  **A.** No.
11  **Q.** I'm going to show you a letter. I'd like for
12  you to mark this as an exhibit.
13  (Exhibit D. Strout-1 was marked for
14  identification.)
15  BY MR. HANNA:
16  **Q.** Do you recognize this letter?
17  **A.** Yes.
18  **Q.** Did you personally cause this letter to be
19  sent to Richard Holland?
20  **A.** Did I personally what?
21  **Q.** Cause this to be sent to Mr. Holland?
22  **A.** Did I personally send it?
23  **Q.** Did you have it personally sent?
24  **A.** Yes.

## 17

1  **Q.** And was it sent on J&D Liquors' behalf?
2  **A.** Yes.
3  MR. HANNA: I'm going to enter
4  another exhibit.
5  (Exhibit D. Strout-2 was marked for
6  identification.)
7  BY MR. HANNA:
8  **Q.** Do you recognize that letter?
9  **A.** Yes.
10  **Q.** Did you personally authorize that letter to
11  be sent?
12  **A.** Yes.
13  **Q.** And was it sent on J&D Liquors' behalf?
14  **A.** Yes.
15  **Q.** Is it a fair interpretation of those letters
16  that either Mr. Holland or Miss Cottrell were to
17  enter your premises for any purpose you would call
18  the police and have trespassing charges filed
19  against them?
20  **A.** Yes.
21  **Q.** Has J&D Liquors ever sent or caused to be
22  sent a letter banning any other person from
23  entering your premises beside Miss Cottrell and
24  Mr. Holland?

## 18

1  **A.** A letter sent?
2  **Q.** Yes.
3  **A.** No.
4  **Q.** Is there anyone else that you have a standing
5  policy of passing trespassing charges on for
6  entering your premises for any purpose?
7  **A.** I mean we've -- the answer would be yes. We
8  have shoplifters that we've had in the past and
9  they would be banned from the premises.
10  **Q.** Do you know any of their names?
11  **A.** I do not.
12  **Q.** Do your employees know their names?
13  **A.** I don't know that answer.
14  **Q.** Were these individuals prosecuted for --
15  **A.** Yes.
16  **Q.** -- shoplifting?
17  And if you wanted to do you believe
18  that you would be able to find the addresses of
19  those individuals?
20  **A.** I would guess through the courts maybe.
21  **A.** No. Each, to the best of my knowledge, each
22  case, part of the -- well, I'm answering for Harry
23  because he's handled those cases, but to the best

Cottrell and Holland vs. J&R Discount Liquor Gallery, Inc., et al.                    David J. Strout, Jr., 8/26/09

|  | 19 |  | 21 |
|---|---|---|---|
| 1 | of my knowledge everyone who has been prosecuted as | 1 | receive a complaint from one of these customers? |
| 2 | part of the agreement has been banned from the | 2 | **A.** Not me personally. |
| 3 | premises by the court. | 3 | **Q.** Not you personally. |
| 4 | **Q.** By the court, okay. | 4 | To the best of your knowledge were |
| 5 | What is J&D Liquors' underage drinking | 5 | those individuals parked in handicapped parking |
| 6 | policy? | 6 | spots? |
| 7 | **A.** I don't understand the question. | 7 | **A.** I don't know. |
| 8 | **Q.** Do you serve individuals who are under 21? | 8 | **Q.** And if they were parked in handicapped |
| 9 | **A.** No. | 9 | parking spots would it make a difference? |
| 10 | **Q.** How do you verify whether or not they're | 10 | **A.** To what? |
| 11 | under 21? | 11 | **Q.** To whether or not you would have banned them. |
| 12 | **A.** Anyone under 30, anyone under the appearance | 12 | **A.** Based on the information I gave you my |
| 13 | of 30 is carded for a New Jersey driver's license, | 13 | reasons why I banned her. |
| 14 | a passport, military ID and whatever is acceptable | 14 | **Q.** Okay.  So you would have banned her |
| 15 | by the state law. | 15 | regardless of what her purpose was because she was |
| 16 | **Q.** Have you ever carded individuals? | 16 | taking pictures? |
| 17 | **A.** Yes. | 17 | **A.** Well, that's one of the reasons I gave you. |
| 18 | **Q.** Has anyone ever not had an identification? | 18 | **Q.** Okay. |
| 19 | You asked for an ID and they didn't have it? | 19 | What was the second reason? |
| 20 | **A.** Yes. | 20 | **A.** The second reason was hampering our ability |
| 21 | **Q.** And has anybody had an identification that | 21 | to satisfy our customers because they would come in |
| 22 | you rejected? | 22 | feeling very uncomfortable when a stranger is out |
| 23 | **A.** Yes. | 23 | there taking their pictures. |
| 24 | **Q.** Has anyone ever become argumentative about | 24 | **Q.** And the third reason was because? |

|  | 20 |  | 22 |
|---|---|---|---|
| 1 | it? | 1 | **A.** Because on, I'm saying five to six, I don't |
| 2 | **A.** Yes. | 2 | know the exact number, she's taken me to court or |
| 3 | **Q.** Has anyone ever become, to the best of your | 3 | taken my staff to court which has cost me a lot of |
| 4 | knowledge, has anyone ever become argumentative or | 4 | money and each charge was thrown out. |
| 5 | belligerent in your store for any other reason? | 5 | **Q.** Why did she take you to court? |
| 6 | **A.** Not to the best of my knowledge. | 6 | **A.** Municipal court tickets. |
| 7 | **Q.** Let's cut to the chase. | 7 | **Q.** Can you think of the first time she took you |
| 8 | Could you list to me the reasons why | 8 | to court? |
| 9 | Miss Cottrell was banned from J&D Liquors' | 9 | **A.** The first time was for a parking ticket for |
| 10 | premises? | 10 | someone parked in the handicapped zone allegedly. |
| 11 | **A.** Because Miss Cottrell continually entered our | 11 | **Q.** Allegedly.  And was there any merit to that |
| 12 | lot taking pictures of customers, and they would | 12 | claim? |
| 13 | come in and complain.  She was hampering our | 13 | **A.** All I can tell you is that it was dismissed |
| 14 | ability to please our customers and took me to | 14 | out of court. |
| 15 | court, took either I or J&D to court five or six | 15 | **Q.** Do you have personal knowledge of the facts |
| 16 | different times, which all were dismissed. | 16 | about that claim? |
| 17 | **Q.** Okay. | 17 | **A.** Yeah. |
| 18 | **A.** And five or six of them, I don't know the | 18 | **Q.** Okay. |
| 19 | exact number. | 19 | And was there a car parked in the |
| 20 | **Q.** So the first, the first reason why was | 20 | handicapped parking space? |
| 21 | because she was taking pictures? | 21 | **A.** There was a car parked near the handicapped |
| 22 | **A.** She was taking pictures of customers that | 22 | space.  Whether it was over the lines or not, I |
| 23 | would come in and complain. | 23 | don't know. |
| 24 | **Q.** To the best of your knowledge, did you ever | 24 | **Q.** Now let's take a step back. |

**ANDREA SEGAL REPORTING**

23

1    Can you give me the reasons why
2  Mr. Holland was banned from the premises?
3    **A.** The same exact reasons as I gave you for
4  Maryann. He was with her each time basically and
5  although the tickets are signed by her he appeared
6  each time to court with her and at the advice of
7  counsel she was -- he was banned also.
8    **Q.** Let's take a step back. Do you provide your
9  customers with handicapped parking?
10   **A.** Yes.
11   **Q.** To the best of your knowledge do most liquor
12  stores provide their customers with handicapped
13  parking?
14   **A.** Yes.
15   **Q.** To the best of your knowledge, do most retail
16  establishments provide their customers with
17  handicapped parking?
18        MR. SHOEMAKER: Objection to form.
19  You can answer to the best of your ability.
20        THE WITNESS: I would assume so.
21  BY MR. HANNA:
22   **Q.** Why do you assume that?
23   **A.** Well, I would assume that there is probably
24  laws requiring handicapped parking spaces in retail

24

1  parking lots.
2    **Q.** Why do you suppose that's the law?
3    **A.** I don't know. I didn't make the law.
4    **Q.** If I had to ask you to guess, I'm going to
5  ask you to give me your best, your opinion as to
6  why the law requires a liquor store to provide a
7  handicapped parking space.
8        MR. SHOEMAKER: And you don't want
9  him to guess?
10        MR. HANNA: No. I want your opinion
11  as to why the law requires a liquor store to
12  provide a handicapped parking space to its
13  customers.
14        MR. SHOEMAKER: Objection to form,
15  but go ahead and answer.
16        THE WITNESS: I was required to put
17  the handicapped spots in when they did our site
18  plan for the liquor store.
19  BY MR. HANNA:
20   **Q.** Do you feel that putting handicapped parking
21  spaces in your lot serves any purpose?
22   **A.** Yes.
23   **Q.** What purpose does it serve?
24   **A.** They're closer to the door.

25

1    **Q.** And why is that important?
2    **A.** It's harder for them to get around.
3    **Q.** Why is it important for them to be able to
4  get into your liquor store?
5        MR. SHOEMAKER: Objection to form.
6        THE WITNESS: Because I'm, you know, I
7  have handicapped customers and, you know, it was
8  required by law also.
9  BY MR. HANNA:
10   **Q.** Describe for me the layout of your premises.
11   **A.** We have a parking lot that you pull in.
12  Depending on which way you're coming, there is,
13  facing the building there is a parking lot to the
14  left. There is a building with two entrances, one
15  corridor with two sides, and then you have one, one
16  building.
17   **Q.** Okay. Could you do me a favor and draw me a,
18  you know, just a simple, to the best of your
19  ability, a layout of the premises? Like for
20  example, let's start out, if we can do like, maybe
21  we do let's say the perimeter of the property, in
22  other words, if you could draw the four corners of
23  the property, something that represents that.
24   **A.** (Witness complies.)

26

1    **Q.** Now, what's on each side?
2    **A.** There is an alleyway here.
3    **Q.** Could you write "alley" there?
4    **A.** (Witness complies.)
5        Then there is another lot, Simpkins
6  Cleaners.
7    **Q.** Could you just write "lot"?
8    **A.** It's not a empty lot, it's a building.
9    **Q.** Okay. Put in Simpkins Cleaners for Simpkins
10  Cleaners.
11   **A.** (Witness complies.)
12   **Q.** Okay. What is on the other side?
13   **A.** Over here is McDonald's. Way in the back
14  there is CVS. There is a cell phone tower here
15  (indicating).
16   **Q.** Okay.
17   **A.** There is access there.
18   **Q.** Access as in?
19   **A.** Car access to a road.
20   **Q.** Car access, okay. And where does that car
21  access take you to?
22   **A.** There is a, if you go this way --
23   **Q.** Now just for description's sake we're talking
24  about a car access route that goes where, towards

| 27 | 29 |
|---|---|
| 1 the CVS? | 1 to scale. This is an imprecise drawing. |
| 2 **A.** Towards the CVS. | 2 THE WITNESS: Store parking lot. |
| 3 **Q.** And past the cell phone tower? | 3 BY MR. HANNA: |
| 4 **A.** Past the cell phone tower. Then you can | 4 **Q.** That is your parking lot? |
| 5 go -- | 5 **A.** That's my parking. This parking back here is |
| 6 **Q.** If you turn out and go to the left where does | 6 basically employee parking. |
| 7 that take you? | 7 **Q.** So the lot behind the store that is |
| 8 **A.** That takes you to Red Bank Avenue. | 8 essentially next to the cell phone tower -- |
| 9 **Q.** If you turn out and go to the right where | 9 **A.** Correct. |
| 10 does that take you? | 10 **Q.** -- that is parking for your employees; is |
| 11 **A.** There is an access road, but I don't know if | 11 that correct? |
| 12 it's one way. | 12 **A.** That's where the employees park, yes. |
| 13 **Q.** Okay. | 13 **Q.** And the lot that is next to the store on the |
| 14 **A.** There is an access road coming off of Route | 14 border with McDonald's, that's the parking for the |
| 15 45 or you can go around to CVS. | 15 public? |
| 16 **Q.** Okay. | 16 **A.** That's correct. |
| 17 Now, how about on the final, on the | 17 **Q.** And your store is just one big square? |
| 18 final border of your property? | 18 **A.** Yes. |
| 19 **A.** As far as my property itself? | 19 **Q.** And the store borders, the edge of the store |
| 20 **Q.** Yes, the outside, the outside of the | 20 goes right up to the alley? |
| 21 property. So you have -- so let's say at, on one | 21 **A.** Yes. |
| 22 end you have a CVS. | 22 **Q.** What marks the division in your property |
| 23 **A.** At the back. | 23 between the McDonald's and your parking lot, your |
| 24 **Q.** At the back. On the side you have a | 24 property and McDonald's property? |

| 28 | 30 |
|---|---|
| 1 McDonald's. On the other side you have a parking | 1 **A.** Well, there is a curb. Then there is |
| 2 lot and a cleaners? | 2 shrubbery and then McDonald's curb. |
| 3 **A.** It's not a parking lot. It's just an | 3 **Q.** To the best of your knowledge where does your |
| 4 alleyway. | 4 property end and this McDonald's property begin? |
| 5 **Q.** An alleyway. And then across the alleyway is | 5 **A.** I don't know. |
| 6 a lot and a cleaners? | 6 **Q.** On your store do you have anything like an |
| 7 **A.** Right. | 7 addition or a foyer where people walk in and out of |
| 8 **Q.** Is there anything else on either of those | 8 the store? |
| 9 sides? | 9 **A.** Yes. |
| 10 **A.** No. | 10 **Q.** Can you draw that? |
| 11 **Q.** And what is on the last remaining side? | 11 **A.** (Witness complies.) |
| 12 **A.** All this is Route 45 (indicating). | 12 **Q.** Do cars more often go through the access, the |
| 13 **Q.** Route 45. | 13 car access from where the CVS is at or from Route |
| 14 Now, where do cars get in and out from | 14 45? |
| 15 Route 45? | 15 **A.** I don't know. I don't know which would be |
| 16 **A.** There is a front entrance. | 16 more. |
| 17 **Q.** Can you mark where it would be? | 17 **Q.** And do you have any idea of how fast cars |
| 18 **A.** Roughly right here (indicating). | 18 usually are when they're pulling in and out of the |
| 19 **Q.** Now, could you put the building footprint, to | 19 parking lots? |
| 20 the best of your ability, the footprint of the | 20 **A.** No. |
| 21 building inside of that lot? | 21 **Q.** Where are your handicapped parking spaces? |
| 22 MR. SHOEMAKER: And of course not to | 22 **A.** Roughly right here (indicating). |
| 23 scale. | 23 **Q.** How many handicapped parking spaces do you |
| 24 MR. HANNA: Not to scale. It's not | 24 have? |

31

1  **A.** We have two.
2  **Q.** Two parking spaces?
3  **A.** (Witness nodding head.)
4  **Q.** Do you have an access aisle?
5  **A.** I don't understand the question.
6  **Q.** Do you have a space in your -- do you have
7  next to one of your handicapped parking spaces a
8  place with blue shaded lines or blue slanted lines
9  that would enable somebody in a van that had a
10 wheelchair to pull off to the side to use that to
11 get in and out of your store?
12 **A.** Yes. I believe there is one on this side,
13 one on this side and then the center is what you're
14 talking about with those lines.
15 **Q.** Okay. So you have two handicapped parking
16 spaces and in the middle of the handicapped parking
17 spaces is an access aisle; is that correct?
18 **A.** That's the best of my knowledge.
19 **Q.** Where are your handicapped parking signs?
20 **A.** In front of the spaces.
21 **Q.** In front of each of the spaces. So there are
22 two. Are they directly centered?
23 **A.** I don't know the answer to that.
24 **Q.** Why did you place those spaces there?

32

1  MR. SHOEMAKER: Objection; form. You
2  can answer.
3  THE WITNESS: During the site plan
4  from the city of Woodbury that's where I was made
5  to put them.
6  BY MR. HANNA:
7  **Q.** Are there any curbs or lips between the
8  handicapped parking space and the entrance to your
9  store that a handicapped person might have to worry
10 about?
11 MR. SHOEMAKER: Objection to form.
12 THE WITNESS: No.
13 BY MR. HANNA:
14 **Q.** Where are the access ramps to your store?
15 **A.** There is no access ramps. It's all flat
16 ground.
17 **Q.** So where would a handicapped person -- so if
18 a person, could you draw me a dotted line where you
19 expect a handicapped person -- I shouldn't say
20 expect. Could you draw me a dotted line where you,
21 okay, expect, draw me a dotted line from where you
22 would expect a handicapped person to walk from
23 their car to the entrance to your store?
24 MR. SHOEMAKER: Do your best.

33

1  MR. HANNA: Strike it.
2  BY MR. HANNA:
3  **Q.** Draw a dotted line from each of the
4  handicapped parking spaces that in your opinion
5  marks the most logical route from the space to the
6  door, to the entrance to your store.
7  **A.** And they can come in this side or they can
8  come in this side (indicating).
9  **Q.** Okay.
10 **A.** Both of which, both of which are flat and
11 both of which have access.
12 **Q.** I want to ask you a question. This
13 representation makes it appear as if the
14 handicapped parking spaces are directly across from
15 the entranceway. Is that correct?
16 **A.** I'm not sure.
17 **Q.** To the best of your knowledge --
18 **A.** If I could look at a picture. To the best of
19 my knowledge it is close.
20 **Q.** It is close, but to the best of your
21 knowledge would you say it's fair to say that the
22 handicapped parking space is somewhat closer to the
23 CVS side of the property than the Route 45 side of
24 the property in relation to the entrance?

34

1  **A.** I do not know.
2  MR. HANNA: I'm going to mark another
3  exhibit.
4  (Exhibit D. Strout-3 was marked for
5  identification.)
6  BY MR. HANNA:
7  **Q.** Is that your parking lot?
8  **A.** Yes.
9  MR. SHOEMAKER: Before we move on,
10 did you have any intention of marking this as well?
11 MR. HANNA: Oh, yes. Let's mark this
12 as 4.
13 (Exhibit D. Strout-4 was marked for
14 identification.)
15 BY MR. HANNA:
16 **Q.** Are these your handicapped parking spaces?
17 **A.** They appear to be.
18 **Q.** Am I correct in assessing that to the right,
19 that to the right of this photograph is Route 45?
20 **A.** Looking at it, yes, to the right is Route 45.
21 **Q.** And to the left is the CVS and the cell phone
22 tower?
23 **A.** That is correct.
24 **Q.** And this is, you can see one handicapped

**35**

1  parking space in this; correct?
2  **A.** Correct.
3  **Q.** And you can see the access aisle; correct?
4  **A.** Correct.
5  **Q.** And from what you know of your lot your next
6  handicapped parking space would be next to the
7  access aisle further to the left?
8  **A.** Correct.
9  **Q.** So the handicapped parking spaces are from
10  the appearance of this picture closer to the CVS
11  than to Route 45 in relation to the entrance of
12  your store?
13  **A.** Can you repeat the question, please?
14  **Q.** Would you agree that the handicapped parking
15  space that's on the left is closer to the CVS than
16  it is to Route 45 in relation to the entrance of
17  your store?  Is the entrance of your store where
18  these two pillars are?
19  **A.** That's one entrance.
20  **Q.** That's one entrance.  Where are the other
21  entrances?
22  **A.** The other entrance is on the other side of
23  that vestibule.
24  **Q.** The other side.  And there is no entrance

**36**

1  where that, I guess that's a neon light, a bug
2  light or something along those lines?
3  **A.** No, they're not entrances.  They're just
4  windows.
5  **Q.** That's not an entrance?
6  **A.** I mean that vestibule is an entrance, but
7  where those lit bottles you see, they're windows.
8  **Q.** So the only two entrances on that vestibule
9  is the one that is, A, facing the truck and there
10  is another one that's facing Route 45?
11  **A.** Correct.
12  **Q.** And the handicapped parking spaces, in
13  relation to that vestibule where both the entrances
14  are located, is it closer to CVS or is it closer to
15  Route 45?
16  **A.** I would say close to Route 45.
17  **Q.** Just Route 45 is to the right; correct?
18  **A.** Correct.
19  **Q.** And CVS is to the left; correct?
20  **A.** (Witness nodding head.)
21  **Q.** Not CVS the building, right, CVS the lot,
22  that property?
23  **A.** I would --
24         MR. SHOEMAKER:   Objection to form.

**37**

1         MR. HANNA:   Okay.  I'm sorry.
2         MR. SHOEMAKER:   I just think it's the
3  definitions that you're using.
4         MR. HANNA:   I'm sorry.
5  BY MR. HANNA:
6  **Q.** When I'm referring to CVS I'm referring to
7  the property that you've marked on this outline of
8  CVS and to where the cell phone tower is and to
9  where this car access lot is.
10  **A.** Right.
11  **Q.** The one that's closest to CVS.  When I'm
12  referring to Route 45 I'm referring to the entrance
13  that goes to Route 45.
14  **A.** Correct.
15  **Q.** Now, in this picture Route 45 is to the
16  right; is that correct?
17  **A.** Correct.
18  **Q.** And the CVS lot, cell tower and that car
19  access aisle, right, that is to the left; correct?
20  **A.** That is correct.
21  **Q.** And the vestibule is to the right of the
22  parking spaces; is that correct?
23  **A.** That is correct.
24  **Q.** Okay.

**38**

1         And the parking spaces are to the left
2  of the vestibule; is that correct?
3  **A.** That is correct.
4  **Q.** And for a person who was parked in one of the
5  parking spaces, they would have to walk towards
6  Route 45 to get to the vestibule; is that correct?
7  **A.** That is correct.
8  **Q.** Could you modify your map to represent what
9  we just observed in these pictures?
10         MR. SHOEMAKER:   Do you want him to
11  use a different type of pen?
12         MR. HANNA:   I don't have one.
13         MR. SHOEMAKER:   Okay.
14         MR. HANNA:   But if you want you can.
15         MR. SHOEMAKER:   It's black also.
16  It's your preference.
17         MR. HANNA:   Yes.
18  BY MR. HANNA:
19  **Q.** Can you put a number two next to that?
20  **A.** (Witness complies.)
21  **Q.** Oh, okay.
22         Now, for somebody, could you draw a
23  dotted line how a person would walk from the
24  parking space that's closest to CVS, to the CVS

### 39

1  parking lot to the entrance at the vestibule?
2  Could you drawn a dotted, not a dashed line, a
3  dotted line?
4  **A.** Did you want dots?
5  **Q.** That's fine.
6  **A.** (Witness complies.)
7  **Q.** That would be the most logical route; right?
8  **A.** They may have entered in, depending on what
9  entrance they're going in.
10  **Q.** I got you.
11        Do you have a fire lane anywhere on
12  the property?
13  **A.** A what?
14  **Q.** A fire lane.
15  **A.** Yes.
16  **Q.** Where is the fire lane at?
17  **A.** The fire lane is next to the building.
18  **Q.** Can you draw it on the diagram?
19  **A.** (Witness complies.)
20  **Q.** Can you think of any reason why a car would
21  be driving up the fire lane instead of the middle
22  of the parking lot?
23  **A.** Driving up it? I don't know what people
24  think when they drive.

### 40

1  **Q.** Are cars allowed to park in your fire lane?
2  **A.** No.
3  **Q.** For a car to be driving in the fire lane, do
4  you agree that you would have to run across, you
5  would have to turn in from the vestibule; is that
6  correct?
7        MR. SHOEMAKER: Objection to form.
8        THE WITNESS: Repeat the question.
9  BY MR. HANNA:
10  **Q.** For a car to drive on the fire lane --
11  **A.** Okay.
12  **Q.** -- they would have to turn in from the
13  vestibule; is that correct? Strike that question.
14        Is it true that the vestibule blocks
15  access from a car driving on 45 to drive into the
16  fire lane?
17        MR. SHOEMAKER: Objection to form.
18        THE WITNESS: Yes.
19  BY MR. HANNA:
20  **Q.** In your experience have you seen a lot of
21  cars parked in the fire lane?
22  **A.** No.
23  **Q.** In your experience have you seen a lot of
24  cars driving through that fire lane?

### 41

1  **A.** No.
2  **Q.** In your experience would you agree that a
3  person walking in the fire lane has less exposure
4  to car traffic than a person walking in the middle
5  of the parking lot?
6  **A.** Yes.
7  **Q.** I'm going to draw a line on this, but I'm
8  going to draw it in a squiggly line.
9        Do you agree the squiggly line I drew
10  goes from the handicapped parking space to the fire
11  lane and then to the entrance?
12  **A.** Yes.
13  **Q.** Do you agree that the squiggly line I drew
14  takes the handicapped person out of traffic more
15  efficiently than the dotted or dashed line that you
16  drew?
17  **A.** No.
18        MR. SHOEMAKER: Objection.
19  BY MR. HANNA:
20  **Q.** Why not?
21  **A.** Because the direct route would be, you asked
22  my opinion if I thought yours was and I don't. The
23  direct route would be from where they exit their
24  vehicle directly to the vestibule.

### 42

1  **Q.** If a blind person was walking from a car to
2  the entrance of your store, do you think that there
3  might be an advantage to walking in a straight line
4  to your store and then walking along the edge of
5  your store to the entrance?
6        MR. SHOEMAKER: Objection to form.
7        THE WITNESS: I don't know.
8        MR. HANNA: You don't know.
9  BY MR. HANNA:
10  **Q.** And do you think that a person should have
11  the ability to do that?
12  **A.** To what?
13  **Q.** Do you think that a handicapped person
14  whether because they had trouble walking or they
15  were blind or had some other disability should be
16  able to walk to the side of your store and follow
17  along the side of your store to get to the
18  entranceway of your building?
19        MR. SHOEMAKER: Objection. Are you
20  asking him does he think the law should require
21  that or does he think --
22        MR. HANNA: I'm asking if he thinks
23  that.
24        MR. SHOEMAKER: Okay.

43

1    THE WITNESS: I would say that I've
2  provided what I've had to by law. I believe they
3  should have access to the store and I believe they
4  do have access to the store.
5  BY MR. HANNA:
6    **Q.** Do you think that a person, right, that a
7  handicapped person should be able to walk to your
8  store and follow the wall and get to the entrance
9  of the store?
10   **A.** What wall?
11   **Q.** The wall that's the exterior wall of your
12 store.
13   **A.** There is a bed of sidewalk and then there is
14 a bed of plants and flowers between the store and
15 the walkway.
16   **Q.** Is the sidewalk, there is a sidewalk there?
17   **A.** There is no sidewalk.
18   **Q.** It's a -- is it a curb?
19   **A.** There is a curb.
20   **Q.** And there is a bed of flowers?
21   **A.** Correct.
22   **Q.** Is the curb and the bed of flowers together
23 greater than arm's length from the walkable portion
24 of the road?

44

1    **A.** I do not know that.
2    **Q.** If it was less than arm's length do you think
3  that a handicapped person should be able to walk
4  from their car and be straight to the store and
5  follow the wall to get to the entrance of your
6  store?
7        MR. SHOEMAKER: Objection.
8        THE WITNESS: There is no wall.
9        MR. HANNA: The wall that's next to
10 the bedding.
11       THE WITNESS: There is a curb.
12 BY MR. HANNA:
13   **Q.** There is a curb.
14   **A.** Is that what you're referring to?
15   **Q.** There is a curb; correct?
16   **A.** Correct.
17   **Q.** And then there is some flowers?
18   **A.** Right.
19   **Q.** Correct? And then there is a wall?
20   **A.** There is a side of the building.
21   **Q.** The side of the building.
22       Do you believe that a person who is
23 handicapped if they believed that it would help
24 them should be able to walk to the side of the

45

1  building and follow the side of the building to the
2  best of their ability to the entrance of your
3  store?
4        MR. SHOEMAKER: Objection.
5        THE WITNESS: I don't know.
6  BY MR. HANNA:
7    **Q.** Earlier you agreed that providing handicapped
8  parking is the law; is that correct?
9    **A.** That is correct.
10   **Q.** You also said that it was the law also that
11 handicapped people could enter your store; is that
12 correct?
13   **A.** That is correct.
14   **Q.** Okay. So then do you agree that if a parking
15 space were blocked the parking space does not
16 fulfill the law's purpose?
17   **A.** Yes.
18   **Q.** If a person were to tell you they concluded
19 that blocking a handicapped parking space with
20 one's own car violates the law that requires you to
21 put a handicapped parking space in your lot, can
22 you agree that even if that were not true it would
23 not be an unreasonable conclusion?
24       MR. SHOEMAKER: Objection to form.

46

1        THE WITNESS: I don't know. Can you
2  repeat the question?
3  BY MR. HANNA:
4    **Q.** Do you agree that it is reasonable for a
5  person to conclude that the same law that requires
6  you to place a handicapped parking space in your
7  lot also is violated, not also, is violated when
8  you park your own car in that spot?
9    **A.** Yes.
10   **Q.** Do you agree that it would be reasonable,
11 whether true or not, but do you agree that it would
12 be reasonable for a person to conclude that it
13 violates the law that requires you to place a
14 handicapped parking space in your lot if you are to
15 park a vehicle in a manner that made it difficult
16 to pull in and out of the parking space without
17 extraordinary effort?
18       MR. SHOEMAKER: Objection. Do you
19 understand his question?
20       THE WITNESS: No.
21       MR. HANNA: Okay.
22 BY MR. HANNA:
23   **Q.** Whether or not their conclusion were true, do
24 you agree that it would be at least reasonable for

47

1   a person to conclude that the same law that
2   requires you to place a handicapped parking space
3   in your lot also is violated if you park a vehicle
4   in a manner that makes it hard for a person to park
5   a vehicle in a handicapped parking space or pull
6   out of that handicapped parking space without
7   extraordinary effort?
8            MR. SHOEMAKER:  Objection. You can
9   answer.
10           THE WITNESS: Yes, I would agree.
11  BY MR. HANNA:
12    **Q.** Can you also agree that if the route between
13  the handicapped parking space and the access ramp
14  into your facility is blocked the purpose of the
15  handicapped parking law is undermined?
16           MR. SHOEMAKER:  Objection. You're
17  asking him for a legal conclusion.
18           MR. HANNA:  Okay.
19  BY MR. HANNA:
20    **Q.** You agreed that the purpose of the
21  handicapped parking law was to allow people to
22  enter, handicapped people to enter your store; is
23  that correct?
24    **A.** Correct.

48

1    **Q.** And presuming that that is what the purpose
2   of the law is, right, to how you understand what
3   the purpose of the law is, can you agree that if
4   the route between the handicapped parking space and
5   the access ramp into your facility is blocked that
6   the purpose of the law has been undermined?
7            MR. SHOEMAKER:  Objection for a
8   couple reasons. I try not to do speaking
9   objections.
10           One, the testimony indicates there is
11  no ramp, and secondly you used singular when you
12  said entrance when the testimony indicates there
13  are two adjacent entrances.
14           MR. HANNA:  Okay. So then let me
15  clarify the question. Okay?
16  BY MR. HANNA:
17    **Q.** You agree in your mind, in your opinion the
18  purpose of handicapped parking laws, the purpose of
19  requiring you to place a handicapped parking space
20  on your property is to allow handicapped people
21  access to your store?
22    **A.** Correct.
23    **Q.** And do you agree that that purpose is
24  undermined if you provided a handicapped parking

49

1   space but there is something blocking the route
2   from the handicapped parking space and the, the
3   route between the handicapped parking space and the
4   entrance to your store?
5    **A.** I would agree if it blocked both entrances.
6    **Q.** So in your opinion you only have an
7   obligation to provide an entrance, make one
8   entrance available, not necessarily the entrance
9   that is closest to the handicapped parking spaces?
10   **A.** We try at all times to make both available.
11  At certain times with deliveries, as you can see
12  here, we have have trucks pull up. Clearly in this
13  picture there is access for a handicapped person to
14  get into either side of the vestibule, but we have
15  no other way to operate a business and run a
16  business without getting deliveries.
17           MR. SHOEMAKER:  When you're talking
18  about the picture, you're talking about D.
19  Strout-3; right?
20           THE WITNESS: Yes.
21  BY MR. HANNA:
22    **Q.** Do you have any ways of loading through the
23  rear of the store?
24    **A.** There are back doors to the store, but there

50

1   are steps and union contracts do not -- do not make
2   delivery men use steps.
3    **Q.** Have you seen these union contracts?
4    **A.** No.
5    **Q.** How do you know about their existence?
6    **A.** We were advised by the drivers.
7    **Q.** Do you think that Miss Cottrell knows about
8   the union contracts?
9    **A.** I can't speak for Miss Cottrell.
10   **Q.** Can you think of any reason why she would?
11   **A.** Again, I can't speak for Miss Cottrell.
12   **Q.** I'm not asking you to speak for
13  Miss Cottrell, I'm just asking can you think of any
14  reason why she would know of the union contracts?
15   **A.** I can't think for Miss Cottrell. I don't
16  know what she thinks.
17   **Q.** I'm asking you if you can think --
18   **A.** I don't know.
19   **Q.** You don't know. You don't know, correct me,
20  you don't know if you know of any reason why
21  Miss Cottrell would know of the union contracts?
22   **A.** No, I don't know.
23   **Q.** So you might know of a reason why
24  Miss Cottrell would know of the union contracts?

51

1   **A.** I don't know what she knows.
2   **Q.** Do you personally know of any reason why
3   Miss Cottrell would know of the contracts?
4   **A.** I don't, no.
5   **Q.** You're answering no, you do not know of any
6   reason why Miss Cottrell would know of the
7   contracts?
8   **A.** No. I don't know what Miss Cottrell knows.
9   **Q.** Yes or no. Do you know of --
10  **A.** No.
11  **Q.** Let me finish the question.
12       Do you know of any reason why
13  Miss Cottrell would know of the union contracts?
14  **A.** No.
15  **Q.** Yes or no. Do you know of any reason why
16  Richard Holland would know of the union contracts?
17  **A.** No.
18  **Q.** Do you agree that it would be reasonable for
19  a person to conclude that your obligation to
20  provide access to your facility with a handicapped
21  parking space also includes an obligation to
22  provide access to the closest entrance to that
23  facility to the handicapped parking spaces?
24  **A.** Can you repeat that?

52

1   **Q.** Whether or not the conclusion was true do you
2   agree that it would be reasonable for a person to
3   conclude that the law that requires you to place
4   handicapped parking spaces also requires you to
5   make the closest entrance to those handicapped
6   parking spaces accessible?
7        MR. SHOEMAKER: Objection. I don't
8   know --
9        MR. SHOEMAKER: Wait a minute.
10  Objection. You're asking him whether it's
11  reasonable to believe something is true even if
12  it's not?
13       MR. HANNA: I am saying is it
14  reasonable to believe if a person, say a person
15  doesn't know for sure, right, and you don't know
16  for sure and that person doesn't know for sure
17  either, right, and I'm asking if a person would be
18  reasonable in concluding that walking that you have
19  an obligation -- if a person would be reasonable in
20  concluding that the law that requires you to place
21  handicapped parking spaces in your lot is violated
22  if they do not have a clear path to the closest
23  entrance to your store to those handicapped parking
24  spaces?

53

1        MR. SHOEMAKER: Same objection.
2        MR. HANNA: Okay.
3        MR. SHOEMAKER: He's not asking you
4   to assume that's the law.
5        MR. HANNA: I'm asking you whether it
6   would be reasonable for a person in your opinion,
7   whether it would be reasonable for a person to
8   conclude that the law that requires you to place
9   handicapped parking in your lot.
10       THE WITNESS: No.
11  BY MR. HANNA:
12  **Q.** That would be unreasonable. Why do you think
13  it would be unreasonable?
14  **A.** I believe as long as there is access that I
15  was made to have by state law, which I have
16  provided, should be sufficient.
17  **Q.** Do you agree that if a person has to walk
18  around a truck to get to the entrance of your store
19  that the purpose of the law that requires you to
20  place handicapped parking in your lot is
21  undermined?
22       MR. SHOEMAKER: Objection. Can you
23  tell him where the truck is? I mean, are you
24  talking about the picture D. Strout-3?

54

1        MR. HANNA: No, I'm not talking about
2   any particular picture. I'm talking in general.
3   BY MR. HANNA:
4   **Q.** Can you agree that if a person walking from
5   the handicapped parking space to the entrance of
6   your store has to walk around a truck to get to the
7   entrance of your store, that the purpose as you
8   understand it of the law that requires you to place
9   handicapped parking in your lot has been
10  undermined?
11       MR. SHOEMAKER: And that's purely
12  hypothetical?
13       MR. HANNA: Yes.
14       MR. SHOEMAKER: You're not telling him
15  that's ever happened, purely hypothetical?
16       MR. HANNA: Purely hypothetical.
17       THE WITNESS: Purely hypothetical,
18  yes.
19  BY MR. HANNA:
20  **Q.** Have you ever met either Miss Cottrell or
21  Mr. Holland before they sought to enforce
22  handicapped parking laws against you?
23  **A.** Mr. Holland was actually a client of mine in
24  my insurance business.

---

55

1   **Q.** Interesting. Do you still have the insurance
2   business?
3   **A.** Yes.
4   **Q.** What's the name of the insurance firm?
5   **A.** Cettei & Connell, Incorporated.
6   **Q.** And he was an insured?
7   **A.** He was an insured.
8   **Q.** What type of insurance was he? Homeowners?
9   **A.** Homeowners. I had no dealings with him.
10  **Q.** You didn't have any personal dealings with
11  Mr. Holland?
12  **A.** (Witness shakes head.)
13  **Q.** How are you aware that he was one of your
14  clients?
15  **A.** I'm aware of everything that goes on in my
16  business.
17  **Q.** Okay. He's no longer one of your clients?
18  **A.** I do not believe so.
19  **Q.** At that period of time would you have known
20  him if you had seen him on the street?
21  **A.** No.
22  **Q.** To the best of your knowledge, do you know
23  whether or not Mr. Holland had ever been in your
24  liquor store?

---

56

1   **A.** No.
2   **Q.** So you don't have any opinion as to whether
3   or not he had ever been in your liquor store prior
4   to when he filed or Miss Cottrell filed complaints
5   against you?
6           MR. SHOEMAKER: Objection. Opinion
7   or does he have knowledge?
8           MR. HANNA: Okay.
9   BY MR. HANNA:
10  **Q.** Do you have, will you agree, do you have any
11  knowledge either way as to whether or not
12  Mr. Holland ever was a customer of your liquor
13  store prior to the date that they began citing you
14  for handicapped parking violations?
15  **A.** No.
16  **Q.** So you don't have knowledge either way?
17  **A.** No. I have no knowledge of him being a
18  customer.
19  **Q.** And do you have --
20  **A.** At any time.
21  **Q.** -- any knowledge of him not being a customer?
22  Would you be able to say with certainty that he had
23  never been a customer?
24  **A.** No.

---

57

1   **Q.** So he could have been a customer and you
2   wouldn't be able to say either which way?
3   **A.** Yes.
4   **Q.** When was the first time that you heard of
5   Miss Cottrell?
6   **A.** In the newspaper.
7   **Q.** Okay. Can you recall what the story was?
8   **A.** It had something to do with Rowan College.
9   **Q.** Rowan College. And when about was that?
10  **A.** I don't recall.
11  **Q.** Do you recall about how long it was before
12  she began citing you parking tickets, handicapped
13  parking tickets?
14  **A.** My guess would be a couple years.
15  **Q.** A couple years?
16  **A.** I probably would say two to three years.
17  **Q.** Was that the only time you had heard of
18  Miss Cottrell prior to when she began to cite you
19  handicapped parking tickets?
20  **A.** To the best of my knowledge.
21  **Q.** And was the fact that -- was the only
22  connection that you had with Mr. Holland prior to
23  when he began to site parking tickets his dealings
24  with your insurance firm?

---

58

1   **A.** Could you repeat the question?
2   **Q.** Strike it.
3           Had you heard of Mr. Holland in any
4   capacity before he filed, before Miss Cottrell
5   began to cite you for handicapped parking
6   violations other than through your insurance firm?
7   **A.** I learned of that after the fact.
8   **Q.** You learned that he was a client of your
9   insurance firm after he filed charges, after
10  Miss Cottrell filed charges against you for
11  handicapped parking violations?
12  **A.** That's correct.
13  **Q.** Was he still an insured at that time?
14  **A.** I don't know.
15  **Q.** Are you aware of how he ceased to be an
16  insured?
17  **A.** I don't know.
18  **Q.** Are you an insurance agent?
19  **A.** Yes.
20  **Q.** Do you represent companies or insureds?
21  **A.** I represent both.
22  **Q.** With regards to Mr. Holland, did you
23  represent his company or Mr. Holland?
24  **A.** My firm represented both.

### 59

1   **Q.** So you acted as a broker to Mr. Holland?
2   **A.** I acted as -- my firm acted as an agent to
3 Mr. Holland.
4   **Q.** And who was his insurer?
5   **A.** I don't recall.
6   **Q.** Do you recall whether or not he was canceled
7 by his insurer?
8   **A.** I believe so, but I'm not positive.
9   **Q.** And do you have any recollection of why he
10 may have been canceled?
11   **A.** To the best of my knowledge, nonpayment of
12 premium.
13         MR. HANNA: Okay. I'm going to
14 reserve the right to request information with
15 regards to that and to redepose you if need be.
16 BY MR. HANNA:
17   **Q.** When did you first learn that Miss Cottrell
18 and/or Mr. Holland were documenting and citing you
19 for handicapped parking violations?
20   **A.** When I received the ticket in the mail.
21   **Q.** So prior to that you had never met them
22 personally?
23   **A.** No.
24   **Q.** When you received the ticket what did you do

### 60

1 next?
2   **A.** I contacted a lawyer.
3   **Q.** Which attorney did you contact?
4   **A.** Christopher Cona.
5   **Q.** And after you contacted the attorney what did
6 you do after that?
7   **A.** He took care of -- he took the tickets and,
8 you know, we had a court date.
9   **Q.** Did you personally make any investigation as
10 to whether or not the allegation made in the ticket
11 was true?
12   **A.** Yes.
13   **Q.** And what did that investigation consist of?
14   **A.** It consisted of pictures that are somewhere.
15   **Q.** So you looked at some pictures?
16   **A.** Um-hum.
17   **Q.** What did the pictures depict?
18   **A.** The pictures depicted it was inconclusive if
19 I could tell if the tires were over the line or not
20 and the court found that they were not and the
21 ticket was dismissed.
22   **Q.** The court made a finding that they were not
23 over the line?
24   **A.** Well, I should retract. The court made a

### 61

1 finding that we were not guilty.
2   **Q.** Did it go to trial?
3   **A.** Yes.
4   **Q.** So there was a trial in which --
5   **A.** I believe there was.
6   **Q.** And did you participate in that trial?
7   **A.** I was at the -- I was at the hearing.
8   **Q.** Did you take any action to defend yourself
9 against this charge?
10         MR. SHOEMAKER: Which charge?
11         MR. HANNA: The first charge I'm
12 talking about. The first charge, the one that you
13 reviewed the pictures, the one that we were just
14 speaking of.
15 BY MR. HANNA:
16   **Q.** Let's take a step back.
17         How many times have you been charged
18 by Miss Cottrell?
19   **A.** I'm going to say five or six. I mean, I
20 don't know the exact number.
21   **Q.** Okay. So the first charge, about when did
22 you receive that ticket in the mail?
23   **A.** As I said earlier, I'm guessing two to three
24 years ago.

### 62

1   **Q.** Okay.
2         So then when you received the ticket
3 how soon thereafter did you contact your attorney?
4   **A.** I actually went to court, and for the
5 hearing, and that's when I hired him.
6   **Q.** You hired him on the day of the hearing?
7   **A.** That's correct.
8   **Q.** And how long after you received the ticket in
9 the mail was the hearing?
10   **A.** I don't recall.
11   **Q.** And the hearing, was that the only ticket
12 that was an issue or were you defending other
13 handicapped parking violation tickets at that
14 hearing?
15   **A.** I believe at that hearing just that one, but
16 I'm not sure.
17   **Q.** And when did you engage in your
18 investigation? Prior to the hearing? Did you
19 engage in your investigation of the merits of
20 Miss Cottrell's allegations prior to the hearing?
21   **A.** Yes.
22   **Q.** Did the hearing take place before or after
23 you received your next citation from Miss Cottrell?
24   **A.** I don't recall.

63

1   **Q.** What did you do when you received your next
2   citation from Miss Cottrell?
3   **A.** Forwarded it immediately to my lawyer.
4   **Q.** Did you make any investigation as to the
5   merits of that, of the second one?
6   **A.** Not me personally.
7   **Q.** How did you receive notice that you were
8   being cited a third time?
9   **A.** Each time was by -- each time was by
10  municipal court ticket.
11  **Q.** In the mail?  Yes?
12  **A.** Yes.
13  **Q.** And with the third ticket did you conduct an
14  investigation as to the merits?
15  **A.** We conducted -- no, we did not conduct a --
16  the third ticket was not for parking and there was
17  only one for parking in a -- in the zone.
18  **Q.** Okay.
19  **A.** The rest were against trucks and things
20  blocking, allegedly blocking entranceways.
21  **Q.** And so to the best of your knowledge is it
22  safe to say that the only time that you conducted
23  an investigation into the merits of Miss Cottrell's
24  allegations was the first time when she charged,

65

1   subsequent, that you made an investigation as to
2   the merits of Miss Cottrell's allegations after the
3   first ticket with regards to the latter tickets,
4   what you really mean is that you gave the truckers
5   instructions; is that correct?
6   **A.** Correct.
7   **Q.** And besides giving the truckers instructions
8   you didn't really make any real investigation into
9   the merits of Miss Cottrell's claims after the
10  first ticket; is that correct?
11  **A.** That's correct.
12  **Q.** How many hearings did you attend with regards
13  to Miss Cottrell's tickets?
14  **A.** I don't have an exact answer.  Do you want me
15  to guess?
16  **Q.** Give me your best recollection.
17  **A.** Three.
18  **Q.** Three hearings?
19  **A.** Maybe four.
20  **Q.** Okay.
21       Do your best to, do you remember at
22  the first -- do you recall the first hearing?
23  **A.** I recall being at the first hearing.
24  **Q.** Describe for me what happened at the hearing.

64

1   when she alleged that there was a car parked in the
2   parking space itself?
3   **A.** Other than making sure that the drivers knew
4   to pull up as far and as close as possible so there
5   was no blockage, that was the extent of the
6   investigation.
7   **Q.** Okay.
8       So the only investigation that you
9   made as to the merits of Miss Cottrell's
10  allegations occurred when you were charged with the
11  first ticket; is that correct?
12  **A.** No.
13  **Q.** Can you describe for me what was the second
14  investigation?
15  **A.** After we received tickets for now having
16  trucks blocking, so-called allegedly blocking the
17  entrance, one entranceway, we had a meeting with
18  all the drivers as they came in and made sure that
19  they pull up as far as possible so there would be
20  no other issues.
21  **Q.** Did you ask them whether they were parked in
22  a manner that blocked the entrance?
23  **A.** No.
24  **Q.** So when you're saying that there was a

66

1   **A.** The prosecutor and my lawyer, myself, my wife
2   and the judge and everybody was sworn in and she
3   had pictures and presented their case and we
4   presented ours and it was dismissed.
5   **Q.** Do you recall what happened at the second
6   time that you had a hearing?
7   **A.** Other than it being a dismissal, no.
8   **Q.** And do you recall anything about the third
9   hearing?
10  **A.** Any hearing I was at, whatever the number may
11  be, what I recall is it being dismissed.  I don't
12  recall the actual hearings.
13  **Q.** Do you recall testifying at any of the
14  hearings?
15  **A.** I'm not sure.
16  **Q.** Do you recall whether or not Miss Cottrell
17  voluntarily dismissed any of hers without having to
18  go to trial, any of the charges that she filed
19  against you?
20  **A.** I don't recall.
21  **Q.** You don't recall whether or not she did or --
22  **A.** I don't.  I do not recollect -- I do not
23  recollect whether or not she did.
24  **Q.** So she may have; is that correct?

Cottrell and Holland vs. J&R Discount Liquor Gallery, Inc., et al                    David J. Strout, Jr., 8/26/09

---

**67**

1  **A.** It's possible.

2  **Q.** I'd like to get a little insight into the

3  decision to ban Miss Cottrell from your premises.

4        When did the idea to ban Miss Cottrell

5  first arise?

6  **A.** After several tickets had been written and

7  customers had been complaining, so I would say

8  right around the time of the letter.

9  **Q.** So around the time of the letter. Now --

10  **A.** Is when the decision was made.

11  **Q.** When the decision was made.

12        Do you recall who was the first person

13  to suggest the idea that you ban her from the

14  premises?

15        MR. SHOEMAKER: Objection. Don't

16  tell him anything about what you and Mr. Cona may

17  have discussed, but outside of those discussions

18  you can answer the question.

19        THE WITNESS: Those were discussions

20  with Mr. Cona.

21  BY MR. HANNA:

22  **Q.** Was anybody else involved in those

23  discussions?

24  **A.** No.

---

**69**

1  **Q.** Did you perceive that there might be any

2  downsides to banning Miss Cottrell?

3  **A.** No, beyond legal advice.

4  **Q.** Okay. Well --

5  **A.** Legal advice would be included in one of the

6  decisions.

7  **Q.** What do you mean? I don't understand what

8  you're saying.

9  **A.** Well, you have a letter here from our lawyer

10  and that was part of the decision to ban her from

11  the premises.

12  **Q.** What was?

13  **A.** My discussions with my lawyer.

14  **Q.** Okay.

15        Well, I'm not asking you what your

16  lawyer told you and I'm not going to ask you what

17  your discussion with your lawyer was, but I am

18  going to ask you if there was any downside that you

19  considered.

20  **A.** No.

21  **Q.** How about the decision to ban Mr. Holland,

22  when did that first arise?

23  **A.** Shortly after this letter was written.

24  **Q.** Shortly after which letter was written?

---

**68**

1  **Q.** Did you discuss the idea of banning

2  Miss Cottrell with anybody else?

3  **A.** No.

4  **Q.** So the ultimate decision was ultimately yours

5  to ban Miss Cottrell?

6  **A.** Yes.

7  **Q.** What factors were considered?

8  **A.** The nonpleasure and complaining of our

9  customers of someone strange taking pictures of

10  their vehicles and their cars with kids and

11  whatever else in it, the amount of money I was

12  spending in tickets and legal fees, and the amount

13  of time I was, I had to have my manager off and

14  paying him to go to court.

15  **Q.** Just a question. How many customers had

16  complained?

17  **A.** That would be a question for the manager.

18  **Q.** What did you perceive to be the benefit of

19  banning Miss Cottrell?

20  **A.** Limiting my legal fees, limiting my getting

21  tickets in the mail every other week and, you know,

22  the time I had to pay employees to go to court and

23  also because she wasn't abling me to keep my

24  clients, my customers satisfied.

---

**70**

1  **A.** I'm sure this letter was written after. Can

2  you repeat the question?

3  **Q.** When did it first occur to you, and this

4  might not be the same question, but strike the

5  former question to the extent it's not, when did it

6  first occur to you that you might want to ban

7  Mr. Holland?

8  **A.** It was based on legal advice.

9  **Q.** But do you recall about when?

10  **A.** Well, I would recall based on my letter about

11  November of '06, but other than when the letter was

12  written, basically at the same time.

13  **Q.** Do you recall how long before you wrote the

14  letter that it first occurred to you that you might

15  ban Mr. Holland from your premises?

16  **A.** No.

17  **Q.** Do you recall whether or not you decided to

18  ban Mr. Holland from your premises before or after

19  the first hearing that you participated in?

20  **A.** After. I didn't know Mr. Holland or

21  Miss Cottrell until that time.

22  **Q.** What factors did you consider in deciding to

23  ban Mr. Holland?

24  **A.** Do you want me to repeat the same ones I just

---

**71**

1  told you for Miss Cottrell?
2  **Q.** Are they the same considerations?
3  **A.** Yes.
4  **Q.** Then yes.
5  **A.** Okay.
6          He appeared with her in each of the,
7  as far as I know, in each of the instances at the
8  store. He was with her each time in court and also
9  based on legal advice.
10  **Q.** What benefit did you think that you would
11  receive from banning Mr. Holland?
12  **A.** I didn't perceive any benefit, that it would
13  stop the harassment of customers and tickets and
14  legal fees and fines.
15  **Q.** So is it correct to say that the desire to
16  avoid future tickets, legal fees and fines was a
17  substantial motivation for banning Miss Cottrell?
18  **A.** My number one motivation --
19          MR. SHOEMAKER: Objection to form. I
20  don't know that he testified he ever avoided fines.
21          MR. HANNA: That's correct.
22          MR. SHOEMAKER: That was part of your
23  question.
24  BY MR. HANNA:

**72**

1  **Q.** I'm going to show you a series of pictures.
2          MR. HANNA: Please mark this as an
3  exhibit.
4          (Exhibit D. Strout-5 was marked for
5  identification.)
6  BY MR. HANNA:
7  **Q.** Is this your parking lot?
8  **A.** Yes.
9  **Q.** Can you identify all of the signs? Can you
10  identify all of the areas that are reserved for
11  handicapped parking? Can you describe them for me?
12  **A.** There is a sign right here. There is a sign
13  right here (indicating).
14  **Q.** That's a bad question. But in this picture
15  do you agree that there are two handicapped parking
16  spaces?
17  **A.** That is correct.
18  **Q.** Do you also agree that there is an access
19  aisle in between those handicapped parking spaces?
20  **A.** That is correct.
21  **Q.** Do you also agree that there are two signs
22  marking each of the handicapped parking spaces?
23  **A.** Yes.
24  **Q.** Okay.

**73**

1          Do you agree that it appears from this
2  picture that the signs, that the sign marking the
3  handicapped parking space that is closest to the
4  man standing appears to be slightly off center and
5  closer to Route 45?
6          MR. SHOEMAKER: Objection.
7          THE WITNESS: I can't tell from that
8  angle. If you give me a direct angle I'll answer
9  the question.
10          MR. HANNA: Fair enough.
11          I'm going to mark another exhibit.
12          (Exhibit D. Strout-6 was marked for
13  identification.)
14  BY MR. HANNA:
15  **Q.** Would you agree that this picture depicts an
16  SUV inside of your handicapped parking space?
17  **A.** I would agree that it appears to be next to
18  the handicapped parking space.
19  **Q.** Maybe we can compare this picture and the
20  last picture. We see that the handicapped parking
21  sign is next to the break in the curb.
22  **A.** Right.
23  **Q.** If you had to estimate from this picture
24  about how far or from your experience, right, from

**74**

1  your knowledge of your property, about how far that
2  sign is posted into the ground next to that break
3  in the curb, about how far would you say it is?
4  **A.** In the ground?
5  **Q.** Yes.
6  **A.** I have no clue. I didn't put the signs in.
7  **Q.** But does it appear to you to be posted
8  somewhere near the center of the parking space?
9          MR. SHOEMAKER: What, the sign?
10          MR. HANNA: The sign, yes. Is the
11  sign posted somewhere near the center of the
12  parking space?
13          THE WITNESS: To the best of my
14  knowledge, yes.
15  BY MR. HANNA:
16  **Q.** And is the space between that sign and the
17  SUV more or less than half a parking space?
18  **A.** I would say less than half the parking space.
19  **Q.** Less than half the parking space.
20          And does it appear to be a lot less
21  than half a parking space or a little less than
22  half a parking space?
23          MR. SHOEMAKER: Objection to form.
24          THE WITNESS: Since I can't see any

## 75

1  lines I don't know.
2  BY MR. HANNA:
3  **Q.** Do you recognize that SUV?
4  **A.** I have an SUV similar. Can I tell you that
5  that's it from here? No. Can you show me a tag or
6  something?
7          MR. HANNA: Do you mind if I take a
8  short break?
9          MR. SHOEMAKER: Not at all.
10         MR. HANNA: I'm going to take a short
11 break.
12         (Recess; 11:28 a.m.)
13             - - -
14         (Resumed; 11:33 a.m.)
15 BY MR. HANNA:
16 **Q.** Here is a question for you. Do you recall in
17 terms of when you banned Miss Cottrell from your
18 premises, was it prior to the first time you went
19 to a hearing for one of her tickets?
20 **A.** No.
21 **Q.** Okay.
22         It was after the first time?
23 **A.** I believe so.
24 **Q.** Was it after the first time but before the

## 76

1  second hearing?
2  **A.** I do not remember.
3  **Q.** Okay.
4          Do you remember going to any hearing
5  after you banned Miss Cottrell?
6  **A.** I do not remember.
7  **Q.** How about Mr. Holland?
8  **A.** I do not remember.
9  **Q.** Did you ban him before or after the first
10 hearing?
11 **A.** After.
12 **Q.** And did you ban him before or after the
13 second hearing?
14 **A.** I don't remember.
15 **Q.** You don't remember.
16         Do you remember whether or not you
17 banned him before or after all the hearings had
18 taken place?
19         MR. SHOEMAKER: We're talking about
20 Holland now?
21         MR. HANNA: Mr. Holland, yes.
22         MR. SHOEMAKER: Okay.
23         THE WITNESS: I do not remember.
24         MR. HANNA: I'd like to enter the

## 77

1  next exhibit.
2          (Exhibit D. Strout-7 was marked for
3  identification.)
4  BY MR. HANNA:
5  **Q.** Do you recognize this picture?
6  **A.** Yes.
7  **Q.** Do you agree that it's a color version of the
8  last picture that we looked at?
9  **A.** Yes.
10 **Q.** Do you recognize that vehicle?
11 **A.** I do.
12 **Q.** And whose vehicle is it?
13 **A.** It's owned by our company.
14 **Q.** And do you agree that a reasonable person
15 could conclude that that vehicle was parked inside
16 the handicapped parking space?
17 **A.** Well, without being able to see the line I
18 would conclude that the tires would be over the
19 line, but whether they're in the space or not I
20 don't know.
21         MR. HANNA: I'd like to enter another
22 picture.
23         (Exhibit D. Strout-8 was marked for
24 identification.)

## 78

1  BY MR. HANNA:
2  **Q.** Would you agree that this picture depicts the
3  same SUV?
4  **A.** Yes.
5  **Q.** And this SUV is still parked. Do you agree
6  that this vehicle appears to be parked inside of a
7  handicapped parking space in this picture?
8  **A.** The entire vehicle or part of it?
9  **Q.** Part of the vehicle.
10 **A.** Part of the vehicle appears to be.
11 **Q.** So a reasonable person could conclude that
12 this car was parked within, a portion of this
13 vehicle was parked inside a handicapped parking
14 space; is that correct?
15 **A.** Yes.
16 **Q.** And you recognize the SUV; right?
17 **A.** Correct.
18 **Q.** And who owns it?
19 **A.** The company owns it.
20 **Q.** Oh, okay.
21         Do you deny that these pictures depict
22 your company's car parked in the handicapped
23 parking space on April 10th, 2006?
24 **A.** I don't know the date, but I would agree that

Caffeen and Holland vs. J&R Discount Liquor Gallery, Inc., et al          David J. Strout, Jr., 8/26/09

| 79 | 81 |
|---|---|
| 1  it appears to be that part of the car is in the | 1  **Q.** Yes. |
| 2  handicapped zone. | 2  **A.** No, I can't conclude that. |
| 3  **Q.** In the prior picture, I guess we're talking | 3  **Q.** Okay. |
| 4  about 6, do you recognize the car that's next to | 4       But is it plausible? |
| 5  it? | 5  **A.** I don't know.  I'd have to know the distance |
| 6  **A.** I do not. | 6  between here and here (indicating). |
| 7       MR. HANNA:   I'd like to enter this as | 7  **Q.** Okay. |
| 8  an exhibit. | 8       Is it reasonable, viewing this picture |
| 9       (Exhibit D. Strout-9 was marked for | 9  would it be a reasonable conclusion from somebody |
| 10 identification.) | 10 viewing this picture that a person coming from the |
| 11 BY MR. HANNA: | 11 handicapped parking space would have to zigzag |
| 12 **Q.** Is this your building? | 12 around the truck to get to that entrance of your |
| 13 **A.** Yes. | 13 store? |
| 14 **Q.** Is this one of the entranceways here, the | 14 **A.** Again, I can't answer the question without |
| 15 part that's left to the two pillars and to the | 15 seeing the spots. |
| 16 right of that tree, is that one of the | 16 **Q.** But viewing the picture in front of you -- |
| 17 entranceways? | 17 **A.** Right. |
| 18 **A.** It is one of them. | 18 **Q.** -- do you think that it would be reasonable |
| 19 **Q.** And is that the entranceway that's closest to | 19 for a person to conclude that a person in your |
| 20 the handicapped parking spaces? | 20 handicapped parking spaces would have to zigzag |
| 21 **A.** I believe so. | 21 around the truck to get to the entrance that's |
| 22 **Q.** Is this truck making deliveries to your | 22 depicted in the picture? |
| 23 business? | 23 **A.** Again, I don't know.  I can't tell where -- |
| 24 **A.** Yes. | 24 I'd have to see the whole picture with the spots in |

| 80 | 82 |
|---|---|
| 1  **Q.** From the appearance of this picture does it | 1  it. |
| 2  appear as if this truck is blocking the entrance | 2  **Q.** Are you familiar with your property? |
| 3  to, that entrance to your business? | 3  **A.** Yes. |
| 4  **A.** I can't tell from this picture. | 4  **Q.** And are you familiar with where the |
| 5  **Q.** From the appearances of this truck, from the | 5  handicapped parking spaces are? |
| 6  appearances of this picture does it appear as if | 6  **A.** I am. |
| 7  this truck is in between the handicapped parking | 7  **Q.** If you -- |
| 8  spaces and that entrance to your business? | 8  **A.** Whether someone would have to zigzag I don't |
| 9  **A.** I can't see the handicapped parking spaces on | 9  know. |
| 10 the other side. | 10 **Q.** Okay. |
| 11 **Q.** Do you agree that it's at least plausible | 11      Whereabouts in this picture do you |
| 12 that this truck is in between the route from the | 12 think your handicapped parking spaces are? |
| 13 handicapped parking spaces and the entrance to your | 13      MR. SHOEMAKER:   Where in the picture? |
| 14 store? | 14      MR. HANNA:   To the outside of the |
| 15 **A.** It's possible that it is in between the | 15 picture. |
| 16 parking spaces and one entrance to my store. | 16      THE WITNESS:  I mean, they're on this |
| 17 **Q.** Okay. | 17 side of the outside of the picture (indicating). |
| 18 **A.** It's possible. | 18      MR. HANNA:   That's a bad question. |
| 19 **Q.** And do you agree that at the very least to | 19      MR. SHOEMAKER:   And for the record, |
| 20 get to that entrance, the entrance that's depicted | 20 he was motioning to the left of the picture. |
| 21 in the picture, the person coming from the farther | 21      MR. HANNA:   Yes, to the left of the |
| 22 handicapped parking space can't take the most | 22 picture. |
| 23 direct route to the entrance to the store? | 23      I'm going to enter another picture. |
| 24 **A.** Can I conclude that? | 24      (Exhibit D. Strout-10 was marked for |

Cottrell and Holland vs. J&R Discount Liquor Gallery, Inc., et al                          David J. Strout, Jr., 8/26/09

---

83

1   identification.)
2   BY MR. HANNA:
3     **Q.** Does this appear to be the same truck as in
4   the previous picture?
5     **A.** Well, they're both Coors Light trucks.
6     **Q.** If you'll notice in the previous picture, can
7   you identify the license plate number? Can you
8   read that?
9     **A.** Yes. It is the same truck.
10    **Q.** All right.
11           From this picture and knowing where
12  your handicapped parking spaces are at, does it
13  appear as if a person would have to walk around the
14  truck to get to the entrance of your store, the
15  closest entrance of your store to the handicapped
16  parking space?
17    **A.** Well, again my same answer is from this one,
18  I can't see the back of the truck, so how would I
19  know if they had to zigzag around it. When I view
20  the back of the truck I'd have to know the distance
21  between the truck and the pole.
22    **Q.** Do you agree that a reasonable person could
23  look at this picture and conclude that a person
24  would have to walk around this truck to get from

---

84

1   the handicapped parking space to the entrance of
2   your store?
3     **A.** Well, do you have a picture showing the truck
4   and the handicapped spots?
5     **Q.** I think so, but we're focused on this picture
6   right now.
7           MR. SHOEMAKER:   Based solely on a
8   review of those two photographs the question is
9   could a reasonable person conclude that a
10  handicapped person would have to zigzag around?
11          MR. HANNA:   Correct, yes, walk around
12  the truck.
13          MR. SHOEMAKER:   Okay.
14          THE WITNESS:   I don't know.
15          MR. HANNA:   I'd like to enter another
16  picture.
17          (Exhibit D. Strout-11 was marked for
18  identification.)
19  BY MR. HANNA:
20    **Q.** Is this your store?
21    **A.** That's correct.
22    **Q.** Does this appear to be the same truck as the
23  other two pictures?
24    **A.** It does.

---

85

1     **Q.** And can you tell that this is the same truck
2   because the license plate is the same as in the
3   others?
4     **A.** That is correct.
5     **Q.** From this picture does it appear as if a
6   person would have to walk around the truck to get
7   to the entrance of your store if they were coming
8   from the handicapped parking spaces?
9     **A.** From this picture, yes.
10          MR. SHOEMAKER:   Are you representing
11  to him that all three pictures were taken on the
12  same date at the same approximate time?
13          MR. HANNA:   I am only asking if this
14  picture, and the answer, and my answer is to the
15  best of my knowledge, yes, but --
16          MR. SHOEMAKER:   The reason I'm
17  asking, when you produced them to me there were no
18  time stamps on them like there were some others,
19  but just to authenticate what these are.
20          MR. HANNA:   I understand. I'm just
21  asking, and this is true of all the pictures I put
22  to you, when I'm asking you a question I'm asking
23  you with regards to the one picture. I may ask you
24  to identify the truck with reference to another

---

86

1   picture, but I'm just asking you by looking at this
2   one picture. Unless I ask you specifically to give
3   me your general impression based upon all the
4   pictures that you've looked at, I'm only asking you
5   based on the one picture.
6   BY MR. HANNA:
7     **Q.** Based on that, is there any amendment to your
8   answer that you would want to make?
9     **A.** And your question is?
10    **Q.** Well, thinking back to when we looked at the
11  last three pictures, I mean you've essentially said
12  that looking at the other two pictures, and correct
13  me if I'm wrong, that you can't tell because of how
14  the picture was taken whether or not a person would
15  have to walk around the truck; is that correct?
16    **A.** That is correct.
17    **Q.** And I'm not asking you to look at these
18  pictures in combination. I'm asking you to look at
19  these pictures individually.
20    **A.** Okay.
21    **Q.** And does your answer stay the same?
22    **A.** My answer would be with the number eleven
23  someone in a wheelchair would have to zigzag around
24  the truck. Someone that would be walking would not

---

87

1  necessarily have to zigzag around the truck.
2  **Q.** Okay.
3  **A.** Because there is an entrance. There is space
4  over here which would not create them to zigzag.
5  In a wheelchair in this picture I believe they
6  would have to zigzag.
7           MR. HANNA:   Okay. I'm going to enter
8  another picture.
9           (Exhibit D.Strout-12 was marked for
10 identification.)
11 BY MR. HANNA:
12 **Q.** Is that your premises?
13 **A.** That is correct.
14 **Q.** And are those your handicapped parking
15 spaces?
16 **A.** That is correct.
17 **Q.** And does that appear to be the same truck?
18 **A.** I have no clue from this picture.
19 **Q.** I'd like to refer you back to this picture.
20 I don't know which exhibit you have it as.
21          MR. SHOEMAKER:   Strout-9.
22          MR. HANNA:   Strout-9.
23 BY MR. HANNA:
24 **Q.** Refer back to Strout-9.

88

1  **A.** (Witness complies.)
2  **Q.** Do you notice on the bottom left-hand corner
3  of that truck? There are two tags, one is a
4  diamond and one is some type of trademark?
5  **A.** Yes.
6  **Q.** Okay.
7           What does that trademark say?
8  **A.** Are you talking about the larger one?
9  **Q.** The larger one.
10 **A.** It says Mickey.
11 **Q.** And in the truck that's in this picture do
12 you notice a similar diamond that's in the most
13 recent picture I gave to you?
14 **A.** Yes.
15 **Q.** And do you notice a similar trademark that
16 says Mickey?
17 **A.** Quite frankly it looks like it says Mackey,
18 but it looks like an A to me in this picture.
19 **Q.** Does it look like the same trademark between
20 the two pictures?
21 **A.** That's the best I can make it out.
22 **Q.** Okay, fair.
23          And do you --
24 **A.** It looks like an A to me.

89

1  **Q.** Okay.
2           From this picture does it look like a
3  person might have to walk around the truck to get
4  to the entrance of your store from this picture
5  alone?
6  **A.** Certainly from the one spot, yes.
7  **Q.** Does it appear that this truck is blocking at
8  least one logical route from the entrance of your
9  store?
10 **A.** I can't answer that when I can't see the
11 store.
12 **Q.** Okay. And from this picture does it appear
13 as if it might be hard for a handicapped person's
14 car or van to pull into or back out of the spot as
15 a result of reducing the room for maneuvering?
16 **A.** No, it does not appear to be.
17 **Q.** I'm going to show you the next one.
18          Oh, back to that question. Next to
19 that handicapped parking space, the one on the
20 left, is that a nonreserved parking space? Could
21 anybody park, is that a parking space next to the
22 handicapped parking space on the left?
23 **A.** Where the vehicle is?
24 **Q.** Well, there is a vehicle. If we start from

90

1  the right of the picture there is the truck. Then
2  there is the SUV.
3  **A.** Um-hum.
4  **Q.** Then there is a handicapped parking space.
5  **A.** Okay.
6  **Q.** The access aisle.
7  **A.** Right.
8  **Q.** Then there is another handicapped parking
9  space; is that correct?
10 **A.** Correct.
11 **Q.** Now, next to that handicapped parking space,
12 the one that's on the left, is that another parking
13 space?
14 **A.** Yes.
15 **Q.** And that's for general parking?
16 **A.** There is no other reserved parking other than
17 the --
18 **Q.** Okay. So any customer could feel free to
19 park in that parking space; is that correct?
20 **A.** Yeah.
21 **Q.** And is it accurate to say that that parking
22 space to the left of the handicapped parking space
23 is closer to the entrance to the store than the
24 parking spaces that may be to the right of the SUV?

Cohen and Holland vs. J&R Discount Liquor Gallery, Inc., et al                                    David J. Stout, Jr. 8/26/09

| 91 | 93 |
|---|---|
| 1  **A.** Which SUV are you talking about in this one | 1  Coors Light truck. |
| 2  (indicating)? | 2  BY MR. HANNA: |
| 3  **Q.** I'm speaking not to the SUV that's in the | 3  **Q.** From this picture does it appear as if a |
| 4  McDonald's parking lot, to the SUV that's in your | 4  person would have to walk around the truck to get |
| 5  parking lot. | 5  to the access ramp? Not the access ramp, to the |
| 6  **A.** Okay. And your question is again? | 6  entrance to your store. |
| 7  **Q.** My question is, are there parking spaces to | 7  **A.** I don't know. I can't see the end of the |
| 8  the right of that SUV? | 8  truck. |
| 9  **A.** To the right of it? | 9  **Q.** Do you recognize any of the cars in the spots |
| 10  **Q.** Yes. | 10  at the far end of the parking lot? |
| 11  **A.** Yes. | 11  **A.** Not in black and white. |
| 12  **Q.** And is it -- and there is an empty parking | 12  **Q.** Is that a place where customers usually park? |
| 13  space to the left of the furthest most left | 13  **A.** You're talking about all the way down? |
| 14  handicapped sparking space; is that correct? | 14  **Q.** Yes. |
| 15  **A.** Yes. | 15  **A.** Sometimes. On one occasion there are |
| 16  **Q.** Is that parking space closer or further to | 16  employees that park there. |
| 17  the entrance of your store than the parking spaces | 17  **Q.** More often than not from your experience, to |
| 18  that are to the right of the SUV that's in that | 18  the best of your knowledge, do customers tend to |
| 19  spot in your lot? | 19  park at this end of the parking lot or to the end |
| 20  **A.** Well, this spot here, the spot to the left of | 20  that's closer to the entrance to the store? |
| 21  the handicapped I think would be about the same | 21  **A.** I don't have an answer for that. I would say |
| 22  distance. | 22  equal. |
| 23  **Q.** As? | 23  **Q.** Okay. Why do you suppose that these |
| 24  **A.** As the handicapped parking spot. | 24  customers, presuming -- if these were customers, |

| 92 | 94 |
|---|---|
| 1  **Q.** Okay. | 1  hypothetically speaking if these were customers who |
| 2  **A.** To the left. Certainly -- | 2  were parked there why do you suppose they would |
| 3  **Q.** But I'm not asking about the handicapped | 3  park farther away from the entrance than an |
| 4  parking space. I'm asking if you compare the | 4  available space that's closer to the entrance? |
| 5  general parking space that's next to the | 5         MR. SHOEMAKER: Objection to |
| 6  handicapped parking space and the general parking | 6  form. |
| 7  spaces that are to the right of the SUV, which of | 7         THE WITNESS: I can't answer for |
| 8  those spaces are closer to the entrance? | 8  somebody on why they park somewhere. |
| 9  **A.** The ones to the left. | 9  BY MR. HANNA: |
| 10  **Q.** To the left is closer to the entrance, right. | 10  **Q.** Do you suppose that it might have something |
| 11         MR. HANNA: I'm going to enter | 11  to do with that truck making it hard to pull in and |
| 12  another picture. | 12  out of the spaces that are closer to the entrance? |
| 13         (Exhibit D. Strout-13 was marked for | 13  **A.** No. |
| 14  identification.) | 14         MR. SHOEMAKER: Objection to form. |
| 15  BY MR. HANNA: | 15  BY MR. HANNA: |
| 16  **Q.** Does this truck appear to be the same truck | 16  **Q.** Do you deny that these pictures depict the |
| 17  as in the previous pictures? | 17  basis for the citation dated September 27th? |
| 18         MR. SHOEMAKER: Referring to the | 18  **A.** What was the citation? |
| 19  Coors Light truck? | 19  **Q.** I don't have it with me, but it was September |
| 20         MR. HANNA: Yes. | 20  27th. Do you deny that on September 27th that you |
| 21         MR. SHOEMAKER: Okay. | 21  were charged with failing to provide access? |
| 22         THE WITNESS: I'll agree that it's a | 22  **A.** I do not know. I don't know the date. |
| 23  Coors light truck. Whether it's the same truck, I | 23  **Q.** I'm going to move on with this. |
| 24  can't see the symbols or license plate, but it is a | 24         MR. HANNA: I'm going to enter the |

## 95

1 next picture.
2          (Exhibit D. Strout-14 was marked for
3 identification.)
4 BY MR. HANNA:
5    **Q.** Is this your building?
6    **A.** Yes, it is.
7    **Q.** And is this truck making deliveries to your
8 building?
9    **A.** Correct.
10   **Q.** Who is Jay Hessco?
11   **A.** Who?
12   **Q.** Who is Jay Hessco?  Do you know that, the
13 name?  It's a brand that's on the back of the
14 truck.
15   **A.** No clue.
16   **Q.** You don't know.  Okay.
17          And do you know who Warren
18 Distributors are?
19   **A.** Yes.
20   **Q.** And who are Warren Distributors?
21   **A.** As far as what they distribute, that would be
22 a question for the manager.  I don't deal with any
23 of the ordering, but I'm familiar with the company
24 as far as paying bills.

## 96

1    **Q.** All right.  Okay.
2          Does it appear from this picture that
3 the truck is blocking one of the entrances to your
4 store?
5    **A.** I can't tell from this view.
6    **Q.** Okay.
7          Does it appear from this picture that
8 the truck is blocking at least one route from the
9 handicapped parking space to the entrance of your
10 store?
11   **A.** Without seeing where the truck is pulled up,
12 I can't answer.  I would say no.
13   **Q.** You would say no or you would say that you
14 can't tell?
15   **A.** I would say that I can't tell.
16   **Q.** And would you say from the placement of this
17 truck in relation to what you know of the parking
18 spaces that are next to it that this truck is
19 parked in a manner that would make it hard to pull
20 in and out of the parking spaces?
21          MR. SHOEMAKER:  What parking spaces?
22          MR. HANNA:  Any of the parking spaces
23 that are next to this truck.
24          THE WITNESS:  Without seeing the side

## 97

1 of the truck I don't know.  I mean, I can't see how
2 far there is between, you know.  I come in and out
3 all the time with trucks parked there with no
4 problem.  I can't give you a definitive answer
5 without seeing the whole picture.
6          MR. HANNA:  Okay.
7 BY MR. HANNA:
8    **Q.** When you come in and out do you park in the
9 customer parking?
10   **A.** Correct.
11   **Q.** You do park in the customer parking?
12   **A.** Um-hum.
13          MR. SHOEMAKER:  That um-hum was a
14 yes?
15          THE WITNESS:  Yes.  Sorry.
16          MR. SHOEMAKER:  I'm just helping the
17 court reporter.
18          MR. HANNA:  Can you mark this one
19 next one, please?
20          (Exhibit D. Strout-15 was marked for
21 identification.)
22 BY MR. HANNA:
23   **Q.** Does this truck appear to be the same truck
24 as the last truck?

## 98

1    **A.** I truthfully don't know.
2    **Q.** I understand.
3    **A.** Because I don't know if that's who
4 distributes Miller Light or not.
5    **Q.** I understand.
6          From this picture is it inconsistent
7 with the prior truck?
8          MR. SHOEMAKER:  Objection to form.
9 BY MR. HANNA:
10   **Q.** From this picture is it feasible that this
11 truck is the same truck as the truck that's
12 depicted in the last picture?
13          MR. SHOEMAKER:  Objection.
14          THE WITNESS:  I don't know.  I can't
15 see the back of it.
16 BY MR. HANNA:
17   **Q.** From this picture does this truck appear to
18 be blocking one of the entrances to your store?
19   **A.** It appears that if you were in a wheelchair
20 it would be blocking the entrance to the store.  If
21 you were walking you would have entrance to the
22 store.
23   **Q.** Okay.
24          Can you tell from the placement of

**99**

1  this truck and your knowledge of the parking lot
2  whether or not this truck being parked here would
3  make it difficult for cars parking in the customer
4  parking lot to pull in and out of the spots?
5  **A.** Any specific spot or just any spot?
6  **Q.** The customer parking spots that are across
7  from this truck.
8  **A.** I can't tell without seeing the whole picture
9  of the parking lot.
10  **Q.** What kind of a car do you typically drive
11  when you drive into this parking lot?
12  MR. SHOEMAKER:  Are you talking about
13  currently or back when these were taken?
14  MR. HANNA:  Back when these were
15  taken.
16  THE WITNESS:  Cadillac Escalade EXT.
17  BY MR. HANNA:
18  **Q.** And how long have you been driving that
19  Cadillac?
20  **A.** Three years.
21  **Q.** Three years, okay.
22  Have you ever driven a conversion van
23  into the spot, into this parking lot?
24  **A.** No.

**100**

1  MR. HANNA:  I'm going to enter
2  another picture.
3  (Exhibit D. Strout-16 was marked for
4  identification.)
5  BY MR. HANNA:
6  **Q.** Is that your store?
7  **A.** That is correct.
8  **Q.** And is that a Warren Distributor truck?
9  **A.** Yes.
10  **Q.** And is that a Miller Light truck?
11  **A.** Correct.
12  **Q.** And from this picture does it appear that if
13  a car that was pulling out or pulling into that
14  handicapped parking space may have reduced room to
15  maneuver their vehicle?
16  **A.** I don't believe so.
17  **Q.** You don't believe so.  Okay.
18  Does it appear as if would that
19  vehicle that was parked in this handicapped or
20  attempting to be parked in the handicapped parking
21  space that you can see in this picture would have
22  the same amount to maneuver if there was not a
23  truck there?
24  **A.** No.

**101**

1  **Q.** Do they have less room?
2  **A.** Yes.
3  **Q.** Next to the handicapped parking space do you
4  see, is there another parking space?
5  **A.** Are you talking in the picture to the left or
6  to the right?
7  **Q.** In the picture that we're looking at, to the
8  right of the handicapped parking space there is
9  another parking space?
10  **A.** Yes.
11  **Q.** And that parking space, is that a general
12  parking space?
13  **A.** I believe so.
14  **Q.** So that's not a parking space that's reserved
15  for people with disabilities; is that correct?
16  **A.** No.
17  MR. HANNA:  I'm going to enter
18  another picture.
19  (Exhibit D. Strout-17 was marked for
20  identification.)
21  BY MR. HANNA:
22  **Q.** Is that your store?
23  **A.** Yes.
24  **Q.** And does that appear to be the same truck?

**102**

1  **A.** It appears to be.
2  **Q.** Okay.
3  And are those two general purpose
4  parking spaces that are depicted in this picture?
5  **A.** Are you talking about the ones to the left or
6  the ones to the right?
7  **Q.** The ones to the right.
8  **A.** There is several parking spaces, yes.
9  **Q.** And it appears as if those are general
10  purpose parking spaces?
11  **A.** Yes.
12  **Q.** And do those parking spaces have cars in them
13  or not?
14  **A.** Right now?
15  **Q.** Yes.
16  **A.** In the picture?
17  **Q.** Yes.
18  **A.** No.
19  **Q.** Would you characterize those parking spaces
20  as being close to the entrance of the store?
21  **A.** Yes.
22  **Q.** Would you characterize those parking spaces
23  as being the closest parking spaces to the entrance
24  of your store?

## 103

1    **A.** Yes.
2           MR. HANNA:  I'd like to enter another
3    picture.
4           (Exhibit D. Strout-18 was marked for
5    identification.).
6           THE WITNESS:  Am I allowed to ask you
7    any questions?
8           MR. SHOEMAKER:  Not about the
9    substance of the case.  Is it about the substance
10   of the case or is it about something just about
11   depositions in general?
12          THE WITNESS:  No, it's not about
13   depositions in general.
14          MR. SHOEMAKER:  Okay.  We can't talk
15   about the substance.
16          THE WITNESS:  Okay.
17   BY MR. HANNA:
18   **Q.** My next question.  Does this depict your
19   parking lot?
20   **A.** Yes.
21   **Q.** Does this appear to be the same truck from
22   the shadow?
23          MR. SHOEMAKER:  Objection.
24          THE WITNESS:  I don't know.

## 104

1    BY MR. HANNA:
2    **Q.** Can you look at the previous picture?
3    **A.** Um-hum.
4    **Q.** Now, if you'll notice directly across from
5    the tire, would you agree that there is a shadow,
6    right, that has a principal piece jutting out and
7    then a smaller piece reconnecting it to the main
8    shadow?
9    **A.** The shadows don't look the same to me.
10   **Q.** Okay.  I'm going to draw on these two
11   pictures.  Can I see the two pictures, please?
12   **A.** Sure (handing).
13   **Q.** I have marked them as A.  Do you agree that
14   the portions marked A are similar in each picture?
15   **A.** They don't look the same to me.
16   **Q.** Do you recognize any of these cars that are
17   parked in the far end of the parking lot?
18   **A.** Yes.
19   **Q.** Which cars do you recognize?
20   **A.** Well, I can basically only tell you the third
21   one down backed in is an employee because I know he
22   backs his truck in, but other than that in black
23   and white I can't identify any other ones.
24   **Q.** Do you think that these cars may be

## 105

1    customers?
2    **A.** I don't know.
3    **Q.** You're not sure?
4    **A.** I wouldn't know.  I can only identify the one
5    based on knowing he backs in.
6    **Q.** Do you have that many employees working in
7    your store at one time?
8    **A.** At times, but as I said, the employee parking
9    for the most part is in the back.
10   **Q.** Why would a customer park further away from
11   the entrance when there are available parking
12   spaces closer to the entrance?
13   **A.** I can't answer that.
14   **Q.** Might it be because the way the truck is
15   parked makes it harder to pull in and out of those
16   parking spaces?
17   **A.** It might be because they don't want anybody
18   to park next to them or scratch their car.  I mean,
19   I really don't know.
20   **Q.** But there is nobody in these parking spots
21   from what you can tell?
22   **A.** Not now, but somebody can pull in just like
23   at the mall.  I park way out because I don't want
24   somebody parking next to it.

## 106

1    **Q.** Okay.
2           And finally let's return back to the
3    picture of the Coke truck that was one of our first
4    exhibits and I've got it buried.
5           MR. SHOEMAKER:  Strout-3.
6           MR. HANNA:  Maybe I can look off of
7    your copy.  Okay.
8    BY MR. HANNA:
9    **Q.** Is that your building?
10   **A.** Yes.
11   **Q.** And that's your lot?
12   **A.** That's correct.
13   **Q.** Is that truck making deliveries to your
14   premises?
15   **A.** Correct.
16   **Q.** And does it appear as if that truck may be
17   blocking the route from at least one of the
18   handicapped parking spaces to the entrance of the
19   store?
20   **A.** In a vehicle or walking?
21   **Q.** When a person has to travel from their
22   vehicle to the entrance of the store.
23   **A.** No, I don't believe it's blocking it.
24   **Q.** Does it seem as if a person would have to

**107**

1  travel around the truck to get to the entrance of
2  your store walking from a car parked in one of your
3  handicapped parking spaces?
4  **A.** Not in this picture it doesn't, no.
5  **Q.** Do you agree that there is a handicapped
6  parking space to the left of that access aisle?
7  **A.** Yes.
8  **Q.** And a person, a handicapped person who is
9  exiting that vehicle, would they be able to walk
10 straight to the building and walk along the wall to
11 the entrance of your store?
12 **A.** No.
13 **Q.** And is that because of the truck?
14 **A.** Yes.
15 **Q.** Are you familiar with how a truck like this
16 gets unloaded?
17 **A.** I don't understand the question quite
18 frankly. I mean, they take them out on hand trucks
19 and bring them in the door.
20 **Q.** Does a ramp come off of the Coca-Cola truck?
21 **A.** Not that I'm aware of.
22 **Q.** Is it an elevator?
23 **A.** Not that I'm aware of.
24 **Q.** Then how does it get from the truck bed down

**108**

1  to the street?
2  **A.** The delivery guy unloads it.
3  **Q.** Okay.
4  **A.** There are certain trucks with ramps and
5  certain trucks that don't. If they're ramped they
6  enter from the back.
7  **Q.** Do you know whether this truck has a ramp or
8  doesn't?
9  **A.** I do not.
10 **Q.** You don't know.
11      And if this truck had a ramp about how
12 far out do you think that the ramp would extend?
13      MR. SHOEMAKER:   Objection to form.
14      THE WITNESS:  I don't know anything
15 about truck's ramps.
16 BY MR. HANNA:
17 **Q.** You don't recall the specific citations that
18 caused you to ban Miss Cottrell and Mr. Holland
19 from your premises? Was there any citation that
20 did not factor into your --
21 **A.** No. Every --
22      MR. SHOEMAKER:   He didn't finish the
23 question. I'm not sure what you said no to.
24      THE WITNESS:  My fault.

**109**

1  BY MR. HANNA:
2  **Q.** Was there any citation issued by
3  Miss Cottrell that did not factor into your
4  decision to ban her from the premises?
5  **A.** I don't know the answer to the question based
6  on the fact that I may have banned her and then
7  received other citations. I don't know the dates
8  of all the citations.
9  **Q.** But at the time that you had issued the
10 banning, right, at the time that the letters had
11 been issued you were motivated by each and every
12 citation that had been issued to date; is that
13 correct?
14      MR. SHOEMAKER:   Objection.
15      THE WITNESS:  No, that's not my sole
16 motivation.
17 BY MR. HANNA:
18 **Q.** Not your sole motivation, but was it one of
19 your motivations?
20 **A.** Yes.
21      MR. HANNA:   All right. I need to
22 take a little break.
23      (Witness excused.)
24          - - -

**110**

1      (Deposition concluded at 12:10 p.m.)

Case 1:08-cv-05418-NLH-KMW   Document 18-5   Filed 01/05/10   Page 31 of 31 PageID: 270

Cottrell and Holland vs. J&K Discount Liquor Gallery, Inc., et al          David J. Strout, Jr., 8/26/09

111

```
 1                  CERTIFICATE
 2
 3          I HEREBY CERTIFY that the proceedings,
 4   evidence and objections are contained fully and
 5   accurately in the stenographic notes taken by me upon
 6   the foregoing matter on Wednesday, August 26, 2009
 7   and that this is a true and correct copy of same.
 8
 9
10          Donna A. Bittner, RMR-CRR, CSR(NJ)
11
12
13          (The foregoing certification of this
14   transcript does not apply to any reproduction of the
15   same by any means, unless under the direct control
16   and/or supervision of the certifying reporter.)
17
18
19
20
21
22
23
24
```